1

2

3

4

5

6

7

8                             UNITED STATES DISTRICT COURT

9                            NORTHERN DISTRICT OF CALIFORNIA

10                                    SAN JOSE DIVISION

11

12   SALINAS VALLEY MEMORIAL                    Case No. 5:17-cv-07076-HRL
     HEALTHCARE SYSTEM,
13                                              ORDER GRANTING IN PART AND
                    Plaintiff,                  DENYING IN PART MOTION TO
14                                              DISMISS COMPLAINT
           v.
15                                              Re: Dkt. No. 10
     MONTEREY PENINSULA
16   HORTICULTURE, INC. dba ROCKET
     FARMS, et al.,
17
                    Defendants.
18

19         Plaintiff Salinas Valley Memorial Healthcare System ("Hospital") says it is a public

20   hospital district and health system in Monterey County.  It sues to recover over $1.4 million it

21   claims defendants owe for alleged underpaid healthcare services that the Hospital provided to the

22   employees of defendant Monterey Peninsula Horticulture, Inc. dba Rocket Farms ("Rocket

23   Farms") and their families.  As its name suggests, Rocket Farms says it is a farm in the

24   agricultural business.  Defendant Monterey Peninsula Horticulture, Inc./Steven Roberts Original

25   Desserts, LLC Employee Benefit Plan ("Plan") is a (now terminated) self-funded ERISA benefits

26   plan.

27         Pursuant to Fed. R. Civ. P. 12(b)(6), defendants move to dismiss the complaint.  Plaintiff

28

United States District Court
Northern District of California

opposes the motion. All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by the undersigned. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. Upon consideration of the moving and responding papers, as well as the oral arguments presented, the court grants the motion in part and denies it in part. Plaintiff will be given leave to amend, but leave is limited to those matters for which amendment is expressly permitted by this order.

**BACKGROUND**

According to the complaint, Rocket Farms previously purchased a health insurance policy for its employees and their families through the Western Growers Association ("Association"). Plaintiff says that, pursuant to its contract with the Association, the Hospital was reimbursed for 83% of its bills for inpatient care and 82% of its bills for outpatient care.

The complaint goes on to allege that beginning on July 1, 2014 and continuing through June 30, 2017, Rocket Farms switched from the Association's contracted health care arrangement to the defendant self-funded Plan, which had no network of hospitals. This change, says plaintiff, was made as part of a deliberate strategy by defendants to cut costs, diminish employees' level of benefits, and underpay the Hospital.

The Hospital says that, after shifting to the self-funded Plan, Rocket Farms began paying roughly only a third of the amounts billed for services rendered. Specifically, the complaint alleges that every one of the Hospital's reimbursement claims was paid at 140% of rates the federal government pays under the Medicare program, which plaintiff says is "an unusually low level of reimbursement" from a non-government payor like Rocket Farms. (Dkt. 1, Complaint ¶ 40). Additionally, plaintiff alleges that Rocket Farms misled its own employees (and the Hospital) about the fact that hospital services would only be covered up to 140% of Medicare rates. Plaintiff further alleges that defendants improperly denied the Hospital's numerous appeals seeking additional payment and aggressively threatened litigation when the Hospital asked any of its patients to pay the balance on any unpaid bill.

The Hospital goes on to allege that in phone calls to verify/approve coverage for several Rocket Farms patients, defendants (falsely) represented to the Hospital that the Plan would cover 70% of the patient's medical bills, up to a certain dollar amount, after which it would cover 100%-

2

--and failed to disclose that payments under the Plan would actually be capped at 140% of Medicare.

Plaintiff says it learned that, as of July 1, 2017, Rocket Farms changed back to the health insurance arrangement under the Association. So, the Plan is no longer in force. Nevertheless, plaintiff contends that doesn't excuse Rocket Farms from paying over $1.4 million for services the Hospital provided during the 3-year period that the Plan was in effect. To that end, it filed the present suit, asserting five claims for relief: (1) violation of ERISA § 502(a)(1)(B); (2) violation of the Affordable Care Act (ACA), Section 2707 "via ERISA § 502(a)(1)(B)"; (3) violation of the Lanham Act § 43(a) (unfair advertising); (4) intentional misrepresentation; and (5) negligent misrepresentation.

The central dispute is whether the Plan required payment at 140% of Medicare, and nothing more (as defendants contend) or whether, as plaintiff claims, the Plan terms mean that the Hospital is owed "reasonable and customary" payments, which the Hospital maintains are well above 140% of Medicare.

Pursuant to Fed. R. Civ. P. 12(b)(6), defendants now move to dismiss the complaint, arguing that the Hospital has no standing to bring the ERISA and ACA claims; and that the complaint fails, in any event, to allege a viable claim for relief. For the reasons to be discussed, the court grants the motion in part and denies the motion in part.

## LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Id.* (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. Id. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). Moreover, "the court is not required to accept legal conclusions cast in the form of factual allegations if those

1   conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness*

2   *Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

3          Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the

4   claim showing that the pleader is entitled to relief." This means that the "[f]actual allegations

5   must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v.*

6   *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L.Ed.2d 929 (2007) (citations omitted)

7   However, only plausible claims for relief will survive a motion to dismiss. *Iqbal*, 129 S. Ct. at

8   1950. A claim is plausible if its factual content permits the court to draw a reasonable inference

9   that the defendant is liable for the alleged misconduct. *Id*. A plaintiff does not have to provide

10  detailed facts, but the pleading must include "more than an unadorned, the-defendant-unlawfully-

11  harmed-me accusation." *Id*. at 1949.

12         Documents appended to the complaint or which properly are the subject of judicial notice

13  may be considered along with the complaint when deciding a Fed. R. Civ. P. 12(b)(6) motion. *See*

14  *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990);

15  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

16         While leave to amend generally is granted liberally, the court has discretion to dismiss a

17  claim without leave to amend if amendment would be futile. *Rivera v. BAC Home Loans*

18  *Servicing, L.P.*, 756 F. Supp.2d 1193, 1997 (N.D. Cal. 2010) (citing *Dumas v. Kipp*, 90 F.3d 386,

19  393 (9th Cir. 1996)).

20                                  **DISCUSSION**

21  A.     **Defendants' Request for Judicial Notice**

22         Defendants' request for judicial notice is granted as unopposed with respect to (1) certain

23  summary plan documents ("SPDs"); (2) excerpts from the Federal Register; and (3) ACA

24  regulations. The court also accepts plaintiff's submission of the SPD the Hospital says is quoted

25  in the complaint. Defendants' request for judicial notice is denied as to an audit report, which is

26  irrelevant to the disposition of issues presented.

27         Pursuant to plaintiff's "Statement of Recent Decision," (Dkt. 23) the court has also

28  received (without objection) a May 3, 2018 "Clarification of Final Rules" published in the Federal

Register.  (Dkt. 23).

### B.    Claim 1:  ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

This claim, as articulated in plaintiff's rather convoluted complaint, appears to be based on two theories.  First, plaintiff contends that the Plan requires the Hospital to be paid the "reasonable and customary" rate for its services---a rate that plaintiff maintains is "significantly higher than 140% of Medicare."  (Complaint ¶¶ 34, 40).  The problem, according to the complaint, is that defendants "did <u>not</u> pay the Hospital at its Reasonable and Customary rates," and instead consistently set payment at the fixed rate of 140% of Medicare.  (*Id.* ¶¶ 37-39).  Second, the complaint goes on to allege that any Plan provisions suggesting that benefits are capped at 140% of Medicare are unenforceable because (1) any such terms are "buried deep" in the Plan and violate ERISA disclosure requirements; and (2) to the extent defendants had discretion to determine the level of payment to be made, defendants had a structural conflict of interest, in that they had a direct financial interest to pay as few benefits as possible.  (*Id.* ¶¶ 215-218).

Defendants move to dismiss, arguing that the Hospital lacks standing to pursue this claim because plaintiff is seeking payment beyond what is owed under the Plan.  Additionally, to the extent the complaint also alleges violations of ERISA disclosure requirements or conflicts of interest, defendants argue that those are breach of fiduciary issues that the Hospital has no standing to assert.

ERISA Section 502(a)(1)(B) provides that a participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  The Hospital is not a Plan participant or beneficiary.  Nevertheless, providers may obtain derivative standing to sue by an assignment from a plan participant or beneficiary. *Misic v. Bldg. Serv. Employees Health & Welfare Trust*, 789 F.2d 1374, 1378-79 (9th Cir. 1986).  The Hospital's complaint alleges that pursuant to a "'Conditions of Admission' form executed by each Rocket Farms beneficiary or participant (and/or a representative of such individual), the Hospital is the assignee of all benefits under the Plan for each of the claims at issue in this case."  (Complaint ¶ 212).  Thus, the Hospital says it "is entitled under ERISA to pursue all payment that

is due to any Rocket Farms beneficiary or participant under the Plan for the medical services rendered to those individuals at the Hospital." (*Id.* ¶ 213).

Defendants do not challenge the allegation that the Hospital obtained valid assignments. Nevertheless, defendants contend that the patient assignments are limited to payment of benefits under the Plan---an assertion that the Hospital does not deny. As such, defendants argue that the Hospital lacks standing to pursue their "reasonable and customary" rate theory because defendants have already paid all that is due under the Plan, and hence, there is no relief that plaintiff may seek under the Plan.

As previewed above, the Hospital disputes that it *properly* was paid according to the Plan terms. Thus, plaintiff says that defendants' motion does not really present an issue of standing. Nevertheless, defendants maintain that plaintiff's theory for payment of "reasonable and customary" rates that are far in excess of 140% of Medicare is based on a flawed interpretation of the Plan's terms.

"To state a claim for benefits under ERISA, plan participants and beneficiaries have to plead facts making it plausible that a provider owes benefits under the plan." *Elizabeth L. v. Aetna Life Ins. Co.*, No. C13-02554 SC, 2014 WL 2621408, at *2 (N.D. Cal. June 12, 2014) (citing 29 U.S.C. § 1132(a)(1)(B); *Iqbal*, 556 U.S. at 677). Thus, "[a] plaintiff who brings a claim for benefits under ERISA must identify a specific plan term that confers the benefit in question." *Steelman v. Prudential Ins. Co. of America*, No. CIV S-06-2746 LKK/GGH, 2007 WL 1080656, at *7 (E.D. Cal., Apr. 4, 2007) (citation omitted). An action may be dismissed "if the plaintiff is not entitled to a benefit they seek under the ERISA-regulated plan." *Id.* (citation omitted).

"In interpreting an ERISA plan, the Court must apply contract principles derived from state law, guided by policies expressed in ERISA and other federal labor law." *Elizabeth L.*, 2014 WL 2621408, at *2 (citing *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997)). "In doing so, the Court must interpret the plan's terms in an ordinary and popular sense, as would a person of average intelligence and experience." *Id.* (citing *Richardson*, 112 F.3d at 985). "In resolving disputes over ERISA plans, the Court must look first to the agreement's specific language and determine the parties' clear intent, relative to the context giving

rise to the language's inclusion." *Id*. (citing *Richardson*, 112 F.3d at 985). "Finally, the Court must construe each provision consistently with the entire document such that no provision is rendered nugatory." *Id*. (citing *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007)).

The Hospital's theory as to why it must be paid a "reasonable and customary" rate far above 140% of Medicare is based on two parts of the Plan---the Schedule of Benefits and the definition of "Allowable Charges." Basically, plaintiff claims that these provisions, taken together, mean that the Hospital must be paid "Allowable Charges" (which include "reasonable and customary" charges) in an amount established by "applicable law"; and, plaintiff says that the applicable law in California sets "reasonable and customary" rates way above 140% of Medicare. For the reasons to be discussed, the court agrees with defendants that the Hospital's proffered interpretation of the Plan fails to establish a plausible claim for relief.

The complaint points out that the Plan's Schedule of Benefits provides, in relevant part:

> All benefits described in this Schedule are subject to the exclusions and limitations described more fully herein including, but not limited to, the Plan Administrator's determination that: care and treatment is Medically Necessary; ***that charges are reasonable and customary (as defined as an Allowable Charge)***; that services, supplies and care are not Experimental and/or Investigational. The meanings of these capitalized terms are in the Defined Terms section of this document.

(Dkt. 16 at ECF p. 18) (emphasis added). Additionally, the complaint notes that the Schedule of Benefits goes on to state that "Covered Charges" for "Hospital Services," including emergency and inpatient care, are paid at "70% after $250 copayment (per admission) and deductible," subject to three exceptions: (1) "Amounts over the Allowable Charge" will not be paid; (2) "Ineligible charges" will not be paid; and neither will (3) "Invalid Charges (Refer to the Claims Review and Validation Program section)." (Complaint ¶ 67; Dkt. 16 at ECF p. 20). The complaint suggests that the latter two exceptions never came up. Plaintiff alleges that defendants never disputed that the services rendered were medically necessary and did not identify any billing errors made by the Hospital. (Complaint ¶ 72).

Focusing, then, on the definition of "Allowable Charge," plaintiff notes that the "Allowable Charge" definition includes language stating:

> The ***reasonable and customary charge*** shall mean an amount equivalent to

the **85th percentile of a commercially available database**, or such other cost or quality-based reimbursement methodologies as may be available and adopted by the Plan. If there are insufficient charges submitted for a given procedure, the Plan will determine an Allowable Charge based upon **charges made for similar services**. Determination of the reasonable and customary charge will consider the **nature and severity of the condition being treated, medical complications or unusual circumstances that require more time, skill or experience, and the cost and quality data for that provider**.

For Covered Charges rendered by a Physician, **Hospital** or Ancillary Provider in a geographic area where **applicable law** dictates the maximum amount that can be billed by the rendering provider, the Allowable Charge shall mean the amount established by **applicable law** for that Covered Charges [sic].

(Dkt. 16 at ECF p. 43) (emphasis added). Plaintiff says this last quoted paragraph is key because California "has a very well-developed body of law that governs how reasonable and customary payment should be determined in the absence of a contract between a payor and a provider." (Dkt. 15 Opp. at ECF p. 13).

The problem for the Hospital is that it ignores the entire first portion of the "Allowable Charge" definition, which says an "Allowable Charge" is the "**lesser** of" four options, only one of which is "the reasonable and customary charge for the same treatment, service, or supply furnished in the same geographic area . . .." (Dkt. 16 at ECF p. 43). The relevant portion of the definition states:

**Allowable Charge** means the charge for a treatment, service, or supply that is **the lesser of**: (i) the charge made by the provider that furnished the care, service, or supply; (ii) the negotiated amount established by a provider network arrangement or other discounting or negotiation arrangement; (iii) the reasonable and customary charge for the same treatment, service, or supply furnished in the same geographic area by a provider of like service as further described below; or (iv) an amount equivalent to the following:

• For specialty drugs, the lesser of average wholesale price (AWP) minus 10% or the amount set by the Plan's prescription drug service vendor;

• For inpatient or outpatient facility claims, an amount equivalent to 200% of the Medicare equivalent allowable.

(*Id.*) (emphasis added). Thus, to the extent that plaintiff contends that "all of the definitions referenced in the Schedule of Benefits confirm that the Plan must pay at a Reasonable and Customary level for service provided by hospitals" (Complaint ¶ 71) at a level far above 140% of

Medicare, it fails to convince. And, while plaintiff points out that the other options for calculating the Allowable Charge include the Hospital's full billed charges, that fact is of no particular import since no one seems to contend that plaintiff's full billed charges would be the "lesser" of the listed options.

Moreover, plaintiff has no rejoinder to defendants' argument that ERISA generally has "powerful preemptive force" with respect to state laws. *Cleghorn v. Blue Shield of California*, 408 F.3d 1222, 1225 (9th Cir. 2005) (observing that ERISA "expressly preempts all state laws 'insofar as they may now or hereafter relate to any employee benefit plan'") (quoting 29 U.S.C. § 1144(a)); *see also Hewlett-Packard Co. v. Barnes*, 571 F.2d 502, 504 (9th Cir. 1978) (holding that "[t]he clear wording of section 514 and the relevant legislative history shows that Congress unmistakably intended ERISA to preempt a state law such as [California's] Knox-Keene [Act] that directly regulates employee benefit plans."); *Vrijesh S. Tantuwaya MD, Inc. v. Anthem Blue Cross Life & Health Ins. Co.*, 169 F. Supp.3d 1058, 1072 (S.D. Cal. 2016) (concluding that a provider's state law claims to recover benefits under the terms of a self-funded plan were preempted by ERISA).

In defendants' view, the Plan (properly construed) means that benefits are paid at a reasonable and customary rate ***up to*** 140% of Medicare, and no more. They say this is so because (1) the Plan provides that "Covered Charges" are determined based on the Plan's Permitted Payment Levels; and (2) the Plan's Claim Review and Validation Program, in turn, provides that the Plan pays hospital providers the reasonable, usual and customary charges up to the Permitted Payment Level of 140% of Medicare. According to defendants, proper interpretation of the Plan goes like this:

Start by looking at the Medical Benefits section of the Plan, which states that "Hospital and Facility charges" are "evaluated under the Claim Review Program," and that "Covered Charges" are determined based on "Permitted Payment Levels":

Medical Benefits apply when Covered Charges are incurred by a Covered Person for care of an Injury or Sickness and while the person is covered for these benefits under the Plan. ***Hospital and Facility charges will be evaluated under the Claim Review Program, and Covered Charges will be determined based upon the "Permitted Payment Levels."*** Please refer to

the Claim Review and Validation Program section of the Plan for additional information about Claim Review and Permitted Payment Levels.

(Dkt. 10-1, Ex. A at ECF p. 30; Dkt. 16 at ECF p. 29) (emphasis added).  The Plan goes on to state that "Covered Charges are the Allowable Charges that are incurred for" a list of services and items, including "Hospital Care," and which "are subject to the benefit limits, exclusions and other provisions of this Plan."  (Dkt. 10-1, Ex. A at ECF p. 30; Dkt. 16 at ECF p. 29).

Defendants further note that, as stated in the Medical Benefits section, "Hospital and Facility charges" are evaluated under the "Claim Review Program."  The Claim Review Program section of the Plan provides, in relevant part:  "For claim determinations made in accordance with the Claim Review and Validation Program, the Usual and Customary fee will be the Permitted Payment Levels."  (Dkt. 10-1, Ex. A at ECF p. 62; Dkt. 16 at ECF p. 62).  "Permitted Payment Level(s)," in turn, is defined as:

> charges for services and supplies included as Covered Expenses under the Plan that are Medically Necessary for the care and treatment of Illness or Injury, but only to the extent that such fees are within applicable limits established in this Plan including, but without limitation, in the Claim Review and Validation Program section of the Plan.

(Dkt. 10-1, Ex. A at ECF p. 61; Dkt. 16, Ex. A at ECF p. 61).  And, the Plan further provides that the Permitted Payment Level for charges by Hospitals is the greater of either Medicare allowable reimbursement plus 40% or 140% of Hospital's costs based on Medicare rates:

> Hospitals and Affiliated Facilities.  The Permitted Payment Level for charges by Hospitals and Affiliated Facilities (collectively, "Hospital Facilities") shall be based upon the greater of Medicare allowable reimbursement plus 40% or 140% of the Hospital's costs reflected in the Hospital's most recent departmental cost ratio report to the Centers for Medicare and Medicaid Services ("CMS") and as published in the American Hospital Directory as the "Medicare Cost Report" (the "CMS Cost Ratio").

(Dkt. 10-1, Ex. A at ECF p. 63).[1]  Thus, defendants argue that the Plan provides that Hospital charges are reimbursed at up to 140% of Medicare, and no more.  Further, defendants point out

---

[1] Of course, the court could be wrong, but the (seemingly) comparable provision in the SPD provided by plaintiff says something different, i.e., it distinguishes between inpatient and outpatient hospital services and contains different percentages (ranging from 135% to 180%) of Medicare and also references "the amount of *usual, customary and reasonable fees* for the *covered services*."  (Dkt. 16 at ECF p. 64).  However, neither side has said anything about this apparent difference.  So, the court proceeds with the arguments that have been presented.

that the Schedule of Benefits states, in bold italic font, that "***The Covered Person may be balanced billed*** [i.e., required to pay the outstanding balance of the provider's bill] ***by the Non-Participating Provider for any amount over the Allowable Charge***." (Dkt. 10-1, Ex. A at ECF p. 20; Dkt. 16 at ECF p. 18). They argue that this sentence would be nugatory if the Plan was required to pay the Hospital's full billed charges---because, in that circumstance, there never would be a balance between what the Plan paid the Hospital and the Allowable Charge.

The complaint alleges that any Plan terms suggesting that benefits are capped at 140% of Medicare are unenforceable because (1) any such terms are "buried deep" in the Plan and violate ERISA disclosure requirements; and (2) to the extent defendants had discretion to determine the level of payment to be made, defendants had a structural conflict of interest, in that they had a direct financial interest to pay as few benefits as possible. (Complaint ¶¶ 215-218). There is no dispute that the Hospital's derivative standing to sue is based on what validly is assigned from Plan beneficiaries. Nor is there any apparent dispute that the relevant beneficiary assignments to the Hospital are limited to claims for payment of benefits under the Plan. As such, defendants contend that allegations about violating disclosure rules or about conflicts of interest essentially are claims for breach of fiduciary duty that plaintiff has no standing to assert. The Hospital does not deny that these kinds of allegations ordinarily pertain to breaches of fiduciary duty. But, pointing out that it has not asserted any actual claims for breach of fiduciary duty, the Hospital argues that it properly may pursue alleged conflicts of interest and enforce ERISA disclosure obligations as part and parcel of its claim to obtain payment of benefits.

With respect to allegations about purported conflicts of interest, defendants' motion to dismiss for lack of standing is granted without leave to amend. By its complaint, plaintiff apparently seeks a determination that defendants abused their discretion and had conflicts of interest that kept them from properly administering the Plan. (*See, e.g.*, Complaint ¶ 38). That strikes the court as a *de facto* claim for breach of fiduciary duty in the guise of a claim for payment of benefits, and plaintiff has not cited authority even remotely suggesting that it properly may pursue that theory.

The court reaches the same conclusion with respect to plaintiff's attempt to enforce ERISA

disclosure rules and regulations. The complaint alleges that provisions---namely, those pertaining to the "Claim Review and Validation Program"---should not be enforced because they are "buried deep" in the SPD; consist of dense, conflicting, and interlinked definitions; and do not bear any relation to the rest of the Plan document. In sum, the Hospital alleges that no ordinary person would understand that the SPD (purportedly) limits benefits for the Hospital's service to 140% of Medicare. (Complaint ¶¶ 74-87). This, says plaintiff, constitutes a violation of 29 U.S.C. § 1022, which provides that an SPD "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a); Complaint ¶ 79. Additionally, plaintiff alleges (Complaint ¶¶ 80-81) that "Claim Review and Validation Program" provisions do not comply with the regulation at 29 C.F.R. § 2520.102-2(b) which requires that "either (1) the description or summary of the restrictive provision must be placed 'in close conjunction with the description or summary of benefits,' or (2) the page on which the restrictive provision is described must be 'noted' 'adjacent to the benefit description.'" *Spinedex Physical Therapy USA, Inc. v. United Healthcare of Arizona, Inc.*, 770 F.3d 1282, 1295 (9th Cir. 2014) (quoting 29 C.F.R. § 2520.102-2(b)).

Although the Hospital argues that it properly may enforce ERISA's disclosure requirements here, most of the cases plaintiff primarily relies upon are inapposite in that they concern suits filed by plan beneficiaries; so, there was no question about standing. Closer to the mark is the *Spinedex* case, cited above. *Spinedex* concerned SPD provisions that imposed a two-year time bar on benefits claims. Pursuant to those provisions, the district court held that the provider's derivative suit for payment of benefits was untimely. The Ninth Circuit reversed. Specifically, it held that the provisions in question were not properly disclosed as required by 29 U.S.C. § 1022(b); and, the failure to properly disclose those provisions rendered them unenforceable. 770 F.3d at 1295-96. Although *Spinedex* indicates that the provider was able to avail itself of the disclosure rule in 29 U.S.C. § 1022(b), that apparently was so that the provider could preserve its ability to pursue the benefits claims indisputably assigned to it by beneficiaries. This court finds no basis to broadly construe *Spinedex* as generally conferring standing upon

providers, like the Hospital, to enforce ERISA's disclosure requirements in derivative suits for payment of benefits. Absent citation to better authority by plaintiff, the court grants defendants' motion to dismiss as to ERISA's disclosure obligations. However, the court will give plaintiff leave to amend.

The complaint alleges that defendants' interpretation can't be correct because the Schedule of Benefits "states only that payment is to be made at the reasonable and customary level, as 'defined as an Allowable Charge.'" (Complaint ¶ 83). Further, plaintiff alleges that the Schedule of Benefits "states that 'Hospital Services' are paid at '70% after $250 copayment (per admission) and deductible,' and that the only applicable limitation on such benefits is the definition of 'Allowable Charge.'" (*Id.*). These allegations, however, turn on plaintiff's interpretation of "Allowable Charge" as requiring payment of "reasonable and customary" rates. For the reasons already discussed, that interpretation is not plausible.

Defendants' motion to dismiss this claim is granted. Except as otherwise set out above, the claim is dismissed with leave to amend.

## C.    Claim 2:   ACA Section 2707, 42 U.S.C. § 300gg-6

As an apparent alternative route to obtain payment of the Plan benefits, the Hospital seeks to enforce maximum out-of-pocket (sometimes referred to as "MOOP") requirements---primarily under the Plan's MOOP terms, but also through the ACA's MOOP provisions. Here, plaintiff refers to limits on the annual out-of-pocket expenses a patient is responsible for paying. In a nutshell, the Hospital claims that defendants not only improperly failed to count all out-of-pocket healthcare expenses toward the annual MOOP threshold for each patient, but also failed to honor the MOOP once the threshold was met (i.e., by paying only 140% of Medicare rates, instead of 100% of a patient's expenses above the threshold).

Defendants move to dismiss, arguing that the Hospital lacks standing to pursue this claim and fails, in any event, to state a viable claim for relief.

### 1.    The Plan's MOOP Terms

In this portion of the complaint, the Hospital says that the ACA's MOOP requirement "is separate and distinct from the annual MOOP limits set forth in the Plan itself, which the Hospital

13

seeks to enforce separate and apart from ACA's MOOP." (Complaint ¶ 94). Because the dispute presented by this litigation is whether the Hospital *properly* was paid under the Plan, insofar as defendants argue that the Hospital lacks standing because it seeks benefits beyond what defendants have already paid (which is all defendants contend is owed), the court doesn't find that particular argument persuasive.

In its opposition, plaintiff seems to argue that the SPD provisions are contradictory with respect to a patient's MOOP. In particular, the Hospital notes that the Schedule of Benefits says:

> Coinsurance will accumulate to the maximum out-of-pocket amount until the maximum out-of-pocket amount, as shown in the Schedule of Benefits, is reached. Then, Covered Charges incurred by a Covered Person will be payable at 100% (except for any charges which do not accrue to the maximum out-of-pocket amount) for the remainder of the Calendar Year.

(Dkt. 16 at ECF p. 19). And, plaintiff says that a similar statement appears in the Schedule of Benefits table: "The Plan will pay the designated percentage of Covered Charges until out-of-pocket amounts are reached, at which time the Plan will pay 100% of the remainder of Covered Charges for the rest of the Calendar Year unless stated otherwise." (*Id.* at 20). The Hospital emphasizes that the Schedule of Benefits table goes on to indicate that "Covered Charges" include "Hospital Services" such as "Room and Board," "Intensive Care Unit," and "Emergency Room Services." (*Id.*). The Hospital argues that these provisions necessarily mean that, for approximately 50-100 Rocket Farms patients whose MOOP thresholds allegedly were reached, the Plan requires defendants to pay 100% of the amounts over the threshold.

Defendants point out that the Plan expressly does not cover "Excess Charges," meaning "[t]he part of an expense for care and treatment of an Injury or Sickness that is in excess of the Allowable Charge." (Dkt. 10-1, Ex. A at ECF p. 49; Dkt. 16 at ECF p. 49). Defendants further argue that this exclusion is entirely consistent with the Schedule of Benefits table, which says that "Amounts over the Allowable Charge" "do not apply toward the out-of-pocket maximum and are never paid at 100%." (*Id.* at ECF p. 22). Plaintiff argues, in its opposition brief, that this carve-out for amounts over the Allowable Charge does nothing to modify the statement immediately above it about payment of 100% of out-of-pocket expenses over the MOOP threshold---at least not without contradicting it entirely. Presumably, plaintiff refers here to language in the Schedule

14

of Benefits stating:

> The Plan will pay the designated percentage of Covered Charges until the maximum out-of-pocket amounts are reached, at which time the Plan will pay 100% of the remainder of Covered Charges for the rest of the Calendar Year unless stated otherwise.

(Dkt. 10-1, Ex. A at ECF p. 22; Dkt. 16 at ECF p. 20). However, defendants note that the Plan states that "Covered Charges are the Allowable Charges that are incurred for" a list of services and items, including "Hospital Care," and which "are subject to the benefit limits, exclusions and other provisions of this Plan." (Dkt. 10-1, Ex. A at ECF p. 30; Dkt. 16 at ECF p. 29). Plaintiff retorts that the terms relied upon by defendants are not adequately disclosed in violation of the disclosure rule under 29 U.S.C. § 1022. But, for the reasons discussed above, the court is not convinced that plaintiff has standing to pursue that theory. Insofar as it is based on the Plan's MOOP terms, this claim is dismissed, with leave to amend.

## 2. The ACA's MOOP Limitation

ACA Section 2707(b) limits the out-of-pocket (MOOP) expenses that a health plan can impose on a patient in a plan year: "A group health plan shall ensure that any annual cost-sharing imposed under the plan does not exceed the limitations provided for under [42 U.S.C. § 18022(c)(1)].". 42 U.S.C. § 300gg-6(b). And, § 18022(c)(1) says that "[t]he cost-sharing incurred under a health plan . . . shall not exceed the dollar amounts in effect" for a given plan year. *Id.* § 18022(c)(1). According to the complaint's allegations: The ACA's MOOP requirement applies to expenditures for essential health benefits (EHBs);[2] and, while self-funded plans are not required to offer EHBs, the defendant Plan allegedly was designed to cover EHBs. Thus, plaintiff says that the ACA's MOOP provisions require the Plan "to provide substantial coverage for those EHBs, and to limit plan members' annual out-of-pocket expenditures for such EHBs." (Complaint ¶¶ 97, 101).

---

[2] Plaintiff refers here to the ten categories of EHBs listed in 42 U.S.C. § 18022(b)(1), i.e., ambulatory patient services; emergency services; hospitalization; maternity and newborn care; mental health and substance abuse use disorder services, including behavioral health treatment; prescription drugs; rehabilitative and habilitative services and devices; laboratory services; preventive wellness services and chronic disease management; and pediatric services, including oral and vision care.

According to the Hospital, defendants essentially ignored the ACA's cost-sharing limitations by paying only a small portion of the Hospital's bills (i.e., 140% of Medicare) and by failing to count the Hospital's charges toward each patient's MOOP threshold, thus leaving Plan beneficiaries to pay the considerable balance of the charges. (Complaint ¶¶ 90, 91, 93). Plaintiff claims that because the Plan had no network of hospitals, the ACA required that "the entire unpaid balance on each reimbursement claim---the so-called 'balance bill'---must count towards satisfying the MOOP . . .." (*Id.* ¶ 92). In other words, once a patient's cost-sharing limit has been met, the Hospital says that the ACA requires defendants to "pay <u>100% of the patient's eligible healthcare expenses</u> above the threshold for the remainder of the calendar year." (*Id.* ¶ 93).

Defendants argue that plaintiff lacks standing to assert claims for alleged ACA violations. Plaintiff maintains that it can bring an ACA claim, via ERISA--which may explain why the complaint styles this claim as one for violation of the "ACA Section 2707(b) via ERISA Section 502(a)(1)(B)." Here, plaintiff alleges that, as stated in 29 U.S.C. § 1185d, ERISA incorporated certain provisions of the Public Health Service Act (as amended by the ACA), including the ACA's MOOP provision. (Complaint ¶ 225). Defendants do not convincingly refute that allegation.

Nonetheless, defendants argue that the claim should be dismissed because the ACA's MOOP requirements (1) do not apply to self-funded plans like the Plan; and (2) do not apply anyway, because the ACA expressly excludes "non-network providers" from the statute's cost-sharing requirements.

The court is unpersuaded by defendants' argument that the ACA MOOP requirements don't apply to self-funded plans like the Plan. As discussed above, the ACA imposes its cost-sharing limitation on "group health plan[s]." 42 U.S.C. § 300gg-6(b). The ACA goes on to define the term "group health plan" as:

> ***an employee welfare benefit plan (as defined in section 3(1) of the Employee Retirement Income Security Act of 1974) to the extent that the plan provides medical care (as defined in paragraph (2))*** and including items and services paid for as medical care) to employees or their dependents (as defined under the terms of the plan) directly or through insurance, reimbursement, or otherwise."

16

*Id.* § 300gg-91(a)(1). "Medical care," in turn, is broadly defined as:

> amounts paid for--
>
> (A) the diagnosis, cure, mitigation, treatment, or prevention of disease, or amounts paid for the purpose of affecting any structure or function of the body,
>
> (B) amounts paid for transportation primarily for and essential to medical care referred to in subparagraph (A), and
>
> (C) amounts paid for insurance covering medical care referred to in subparagraphs (A) and (B).

*Id*. § 300gg-91(2)(A)-(C). And, relevant to the discussion here, ERISA section 3(1) defines the terms "employee welfare benefit plan" and "welfare plan" as:

> ***any plan, fund, or program*** which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, ***through the purchase of insurance or otherwise***, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . .

29 U.S.C. § 1002(1). The court is satisfied that "group health plan" as used in the ACA's MOOP provision applies to the Plan. Defendants have not convincingly demonstrated that definitions for the different term "health plan," as defined elsewhere in the ACA, govern.

Even so, defendants argue that this claim is subject to dismissal because the ACA's cost-sharing requirements expressly exclude balance bills from non-network providers. They point out that the ACA provides:

> **(A) In general**
>
> ***The term "cost-sharing" includes***--
>
> (i) deductibles, coinsurance, copayments, or similar charges; and
>
> (ii) any other expenditure required of an insured individual which is a qualified medical expense (within the meaning of section 223(d)(2) of Title 26) with respect to essential health benefits covered under the plan.
>
> **(B) Exceptions**
>
> ***Such term does not include*** premiums, ***balance billing amounts for non-network providers***, or spending for non-covered services.

42 U.S.C. § 18022(c)(3) (emphasis added). The key dispute here is whether the cost-sharing

exception under § 18022(c)(3)(B) for "non-network providers" applies to the Hospital.

Defendants say yes, pointing out that the Plan had a network of providers, and the Hospital was

not in that network. So, defendants argue that logically, the Hospital was a "non-network

provider" with respect to the Plan. Plaintiff, on the other hand, argues that the exception does not

apply because the Plan has no network of hospitals at all---ergo, plaintiff contends, there can be no

such thing as an "in-network hospital" or a "non-network hospital." In plaintiffs' view, the "non-

network providers" exception only applies to group health plans that actually have a network of

providers that can provide the hospital services covered by the Plan. (Complaint ¶ 175).

Defendants point out that in a similar case filed by the Hospital, a court in this district

rejected the very argument that plaintiff presents here. Indeed, in *Salinas Valley Mem'l*

*Healthcare Sys. v. Envirotech Molded Products, Inc.*, Judge Koh concluded that under the plain

language of the statute, plaintiff's interpretation of the term "non-network provider" was

unpersuasive:

> The Court does not find Plaintiff's position to be the most reasonable
> interpretation of "non-network provider" as used in § 18022(c)(3)(B).
> Under a plain reading of those words, a hospital is a "non-network
> provider" in relation to a health plan if (1) the health plan has a network of
> providers; and (2) the hospital is not one of those providers. Under this
> straightforward reading, Plaintiff would qualify as a "non-network
> provider." In contrast, ***Plaintiff's interpretation of "non-network***
> ***provider" adds another requirement***. In Plaintiff's view, a hospital is a
> "non-network provider" in relation to a health plan only if (1) the health
> plan has a network of providers; (2) the hospital is not one of those
> providers; ***and (3) health plan beneficiaries have an in-network option for***
> ***obtaining the services that the hospital provides***. Thus, under Plaintiff's
> construction of § 18022(c)(3)(B), because none of Defendants' in-network
> providers offered the hospital and emergency services that Plaintiff
> provided to the Patient, Plaintiff cannot be considered a "non-network
> provider"---even though Defendants had a network of providers and
> Plaintiff was not part of that network.

No. 17-CV-03887-LHK, 2017 WL 5172389, at *4 (N.D. Cal., Nov. 8, 2017) (emphasis added).

Apparently, the only support plaintiff cited for its interpretation of "non-network provider" was a

citation to the regulation at 45 C.F.R. § 156.130. Judge Koh was not persuaded by that argument

either:

18

. . . . Plaintiff points specifically to 45 C.F.R. § 156.130(c), which states as follows:

> (c) Special rule for network plans. In the case of a plan using a network of providers, cost-sharing paid by, or on behalf of, an enrollee for benefits provided outside of such network is not required to count toward the annual limitation on cost sharing (as defined in paragraph(a) of this section).

Plaintiff argues that "[t]he wording of this regulation strongly suggests that, in order for 'network providers' and 'non-network providers' to be meaningful categories, the health plan at issue must use a network of providers." Pl. Opp. at 9.

However, Plaintiff has not alleged that Defendants did not use a network of providers. Instead, Plaintiff has alleged that there were no in-network providers of emergency services and hospital care. *See* Compl. ¶ 33. Further, Plaintiff concedes that self-insured plans, like Defendant Plan, are not required to offer any particular essential health services or set of health services. Pl. Opp. at 5–6. Thus, given that self-insured plans are not required to cover any particular essential health services, it appears inconsistent that self-insured plans would be required to include providers of any particular essential health services in their networks. Thus, the Court is not persuaded by Plaintiff's argument regarding 45 C.F.R. § 156.130(c).

*Id.*

In response, the Hospital hastens to point out that although Judge Koh found the defendants' interpretation of § 18022 to be more consistent with the plain language of the statute, she also "acknowledge[d] that self-insured plans, like Defendant Plan, can circumvent 42 U.S.C. § 18022(c)(1)'s cost-sharing limitations by excluding providers of expensive services---such as hospital and emergency services---from their networks," noting that such conduct "would be inconsistent with the spirit of the statutory scheme." *Id.* Nevertheless, Judge Koh's ultimate conclusion is what it is---and this court is inclined to agree with it, unless plaintiff has something more that will persuade its interpretation of § 18022 is at least plausible.[3]

Noting that Judge Koh granted the Hospital leave to amend in her case, plaintiff says that its amended pleading included additional details, which are also in the complaint now pending before this court. Those additional details allege that by paying for all Hospital services at 140% of Medicare, defendants engaged in improper "reference pricing" with respect to the Hospital's

---

[3] In a sur-reply, plaintiff also asks this court to consider other circumstances in the *Envirotech* matter. However, in resolving the present motion, the undersigned cannot be guided by what the *Envirotech* court reportedly discussed in a subsequent case management conference or what the defendants in that case did or did not do in addressing the claims asserted against them.

services.  The upshot, says plaintiff, is that the "non-network providers" exception to cost-sharing in § 18022(c)(3) doesn't apply.  Plaintiff's allegations here are very convoluted and require some unpacking.

According to the complaint:  In a "reference pricing" model, a plan sets a "reference price" for a certain procedure, such as a knee replacement.  This price is disclosed to plan members in advance and is designed to incentivize members to look for the best price for the procedure. (Complaint ¶ 143).  The complaint goes on to allege, by way of an example, if a plan sets a reference price of $30,000 for a knee replacement, and a patient obtains service from a provider that accepts the $30,000 price (or less) as payment in full, then the patient pays nothing.  (*Id*. ¶ 144).  By contrast, if a patient goes to a provider that charges $45,000 for the service, then the plan pays $30,000 (after the patient's deductible or copayment), and the patient is liable for the remaining $15,000.  (*Id*. ¶ 145).  The complaint further alleges that the concept of "reference pricing" typically applies to hospital services, but does not make sense for emergency or inpatient care---because in a medical emergency, a patient typically cannot choose what hospital to go to. (*Id*. ¶¶ 148, 152).

Plaintiff says that throughout the self-funded period, defendants imposed an improper "reference price" (i.e., 140% of Medicare) for the Hospital's services across the board.  Here, the Hospital alleges that one of defendants' consultants would issue a "Report and Recommendation" for a "Reference Based Pricing Review" for each of the Hospital's claims.  (Complaint ¶¶ 154-155).  This, according to the complaint, was done without any effort by defendants to set specific reference prices for individual procedures at levels that any hospital in geographic area was willing to accept.  Moreover, the 140% Medicare "reference price" allegedly was "largely" applied to bills for emergency and inpatient care.  (*Id*. ¶ 157).

In this way, the Hospital claims that defendants violated written guidance (i.e., FAQs) provided by the Departments of Labor, Treasury, and Health and Human Services, which are the agencies tasked with implementing the ACA.  (Complaint ¶ 161).  Specifically, the complaint says that agency FAQs issued in May 2014 and October 2014, in relevant part:

- expressed concern that a reference pricing structure "may be a subterfuge for the

imposition of otherwise prohibited limitations on coverage, without ensuring access

to quality care and an adequate network of providers";

- expressly prohibited a reference pricing structure from being used "as a subterfuge

    for otherwise prohibited limitations on coverage"; and

- made reference pricing inapplicable to emergency services; but

- nonetheless indicated that a reference pricing structure that treated providers who

    accepted the reference amount "as the only in-network providers" would not run

    afoul of the ACA's MOOP requirement, "provided the plan uses a reasonable

    method to ensure that it provides adequate access to quality providers."

(*Id*. ¶¶ 163, 166).

The complaint goes on to allege that by failing to have a network that included any

hospitals, defendants used a reference pricing structure for hospital services as a subterfuge,

without ensuring that plan members had reasonable access to quality providers. (Complaint ¶

176). The consequence, says plaintiff, is spelled out in another agency FAQ issued on April 20,

2016:

> Q7: If a non-grandfathered large group market or self-insured group health
> plan as a pricing structure in which the plan pays a fixed amount
> (sometimes called a reference price) for a particular procedure, **but the plan
> does not ensure that participants have adequate access to quality
> providers that will accept the reference price as payment in full**, **is the
> plan required to count an individual's out-of-pocket expenses for
> providers who do not accept the reference price toward the individual's
> MOOP limit**?

> ***Yes***. The Departments' previous guidance explained that, for purposes of
> PHS Act section 2707(b), a plan that utilizes a reference-based pricing
> design (or similar network design) may treat those providers that accept the
> reference-based price as the only in network providers and not count an
> individual's out-of-pocket expenses for services rendered by other providers
> towards the MOOP limit only if the plan is using a reasonable method to
> ensure adequate access to quality providers at the reference price. **A plan
> that merely establishes a reference price without using a reasonable
> method to ensure adequate access to quality providers at the reference
> price will not be considered to have established a network for purposes
> of PHS Act section 2707(b)**. . . .

(Complaint ¶ 174). So, back to the basic issue: Does the ACA's cost-sharing exception for "non-

network providers" apply to the Hospital? The Hospital says no, contending that the above-quoted

FAQ makes it "crystal clear" that if a plan is going to have a reference price (i.e., 140% of

Medicare) for hospital services, then it has to have a network of hospitals, or at least one that includes hospitals (i.e., providers who accept the reference price (or less) as full payment)---if not, then the ACA's MOOP requirement is triggered.

Defendants reiterate that the Plan had a network of providers; the Hospital was not in it; and hence, under the plain language of the cost-sharing exception for "non-network providers," plaintiff clearly was a "non-network provider" under 42 U.S.C. § 18022(c)(1)(3). However, they do not squarely address the complaint's allegations about plaintiff's reference price theory. Indeed, they don't say much about it at all, except that it's confusing. And, their passing comments about network adequacy standards are not developed enough to be convincing here. The court does not find the Hospital's reference price theory to be "crystal clear," as plaintiff contends. And, it remains to be seen whether plaintiff will actually prevail on that theory. But, on this record, the court is unprepared to find that plaintiff's reference price theory is completely implausible, as a matter of law.

Even if the ACA's MOOP requirement is triggered, defendants argue that this claim must still be dismissed because (1) defendants fully complied with the ACA's MOOP requirements; and (2) plaintiff has offered no legal support for the essential claim that a patient's "balance bill" is part of either the EHBs or the MOOP. These arguments fail to convince.

Pointing to excerpts from the Federal Register, defendants contend that in paying the Hospital 140% of Medicare, they have fully complied with the ACA's MOOP requirement. Those excerpts concern the so-called "Greatest of Three" regulation, which provides, in relevant part:

b. Out-of-Networking Cost-Sharing Requirements

*****

[O]ut-of-network providers may bill patients for the difference between the providers' billed charges and the amount collected from the plan or issuer and the amount collected from the patient in the form of a copayment or coinsurance amount (referred to as balance billing). Section 1302(c)(3)(B) of the Affordable Care Act excludes such balance billing amounts from the definition of cost sharing …***Because the statute neither requires plans or issuers to cover balance billing amounts, nor prohibits balance billing, even where the protections in the statute apply, patients may still be subject to balance billing***. …

[T]he Department determined it necessary that a reasonable amount be paid

22

before a patient becomes responsible for a balance billing amount. Therefore … a plan or issuer must pay a reasonable amount for emergency services by some objective standard. **Specifically, a plan or issuer satisfies the copayment or coinsurance limitations in the statute if it provides benefits for out-of-network emergency services (prior to imposing in-network cost sharing) in an amount at least equal to the greatest of**: (1) The median amount negotiated with in-network providers for the emergency services; (2) the amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as the usual, customary, and reasonable amount); **or (3) the amount that would be paid under Medicare for the emergency service (minimum payment standards)**.

(Dkt. 10-1, Ex. B) (emphasis added). Defendants maintain that this means (1) payment by plans at 100% of Medicare is appropriate for non-contracted providers; and (2) if provider bills the patient for amounts exceeding 100% of Medicare, then the patient can be liable under the ACA without any concern as to whether the MOOP has been reached. And, because they paid the Hospital 140% of Medicare (i.e., an "objective standard"), defendants contend that they satisfy the ACA's MOOP requirements anyway. However, plaintiff points out that, as reflected in a May 3, 2018 agency "Clarification of Final Rules" in the Federal Register, the quoted regulation sets the *minimum* that plans are required to pay for out-of-network emergency services. (Dkt. 23 at 9). More to the point, plaintiff correctly notes that the plain text of the regulation requires payment of the "greatest" of the three listed amounts. The Hospital maintains that the second option for payment of "the usual, customary, and reasonable amount" is far greater than 140% of Medicare. Thus, this court is not convinced that simply paying for the Hospital's services according to an "objective standard" is sufficient to bring defendants in compliance with the ACA, as they seem to claim.

Nevertheless, defendants maintain that this claim must be dismissed because plaintiff has offered no legal support for the essential claim that a patient's "balance bill" is part of either the EHBs or the MOOP. The specific focus of defendants' concern seems to be that the Hospital might be claiming that defendants are required to pay a patient's balance bill, including for services that are *not covered* by the Plan. Here, defendants seize upon allegations that "balance bills are a form of cost-sharing because patients themselves are financially responsible for all amounts that the Plan does *not* pay." (Complaint ¶ 120) (emphasis added). Now focusing on what the ACA's cost-sharing definition *includes*, defendants point out that the ACA says that a

23

patient's "cost chare" includes the "deductible, coinsurance, copayments or similar charges." 42 U.S.C. § 18022(c)(3). Defendants argue that nowhere does the ACA say that a patient's "'cost share' is that portion of a provider's charges that are **not covered** by the insurance policy or self-funded plan." (Dkt. 17, Reply at ECF p. 15) (emphasis added).

Although the court has noted more than once that the complaint's allegations are very dense, the court finds no basis for defendants' concern that the complaint seeks payment for services that were **not covered** by the Plan. As discussed above, the complaint alleges that once a patient's cost-sharing limit has been met, the Hospital says that the ACA requires defendants to "pay <u>100% of the patient's **eligible** healthcare expenses</u> above the threshold for the remainder of the calendar year." (Complaint ¶ 93) (emphasis added). Additionally, the claim appears to be premised on EHBs, which the Plan allegedly was designed to cover, even though it was not required to do so. (Complaint ¶¶ 99-100). The Hospital alleges that the medical services it provided to Rocket Farms patients during the self-funded period---including emergency care and inpatient services---"are among the most important categories of EHBs." (*Id*. ¶ 99). And, "because the Plan [allegedly] paid at such an inadequate level," the opposition brief seems to confirm that plaintiff's position is that "the Plan must 'pick up' the balance for **covered medical services** above and beyond the [MOOP] threshold." (Opp. at ECF p. 16) (emphasis added).

Based on the foregoing, this claim is dismissed with leave to amend as to plaintiff's theory re the Plan's MOOP terms. However, defendants' motion to dismiss this claim based on the ACA's MOOP provisions is denied.

### D. Claim 3: False Advertising, Lanham Act, Section 43(b)

This claim alleges that while the Plan was in effect, Rocket Farms reassured its employees that the medical care provided by the Hospital was completely covered by the Plan and that they should continue going to the Hospital's emergency room for services, whether or not it was an emergency. Rocket Farms allegedly knew these representations were false---specifically, that the Hospital's emergency services were no longer covered at an adequate level and that the Plan was set up in a way that would not fairly compensate the Hospital. Plaintiff says that Rocket Farms' alleged false statements resulted in "dramatic overutilization of the Hospital's emergency

services," whereby the Hospital was forced to (1) use emergency room resources to treat every Rocket Farms patient that showed up, even if there was no emergency; and (2) accept "an extremely low level of payment, which Rocket Farms and the Plan refused to reconsider despite hundreds of requests." And, by switching to an out-of-network arrangement, plaintiff says that Rocket Farms made it impossible for its employees to seek more cost-effective outpatient care from the Hospital's clinics or urgent care centers. (Complaint ¶¶ 59-62, 229-240). The complaint further alleges that plaintiff "was economically harmed" and that Rocket Farms' alleged conduct "made it more difficult for the Hospital to compete in the marketplace for healthcare services." (*Id.* ¶¶ 61, 236). The Hospital seeks trebled damages, plus disgorgement of Rocket Farms' "ill-gotten gains from improperly shifting its employees' healthcare costs onto the Hospital during the Self-Funded Period," as well as an injunction prohibiting Rocket Farms from repeating its allegedly unlawful behavior. (*Id.* ¶¶ 238-239).

Defendants' motion to dismiss presents two issues. First, the parties disagree whether the Hospital has pled sufficient facts establishing that it falls within the "zone of interest" protected by the Lanham Act, as described in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).[4] Second, even if the Hospital properly may assert a claim, defendants contend that the claim sounds in fraud and therefore must (but fails to) meet the heightened pleading standard under Fed. R. Civ. P. 9(b). Plaintiff points out that, although district courts are split on the issue (and that it is not aware of pertinent Ninth Circuit authority), a number of courts have held that the heightened Rule 9(b) pleading standard does not apply to Lanham Act claims. Because the court agrees with defendants on the first issue, it does not reach the second.

The Lanham Act "creates two distinct bases of liability: false association, [15 U.S.C.] § 1125(a)(1)(A), and false advertising, [15 U.S.C.] § 1125(a)(1)(B)." *Lexmark Int'l, Inc.*, 134 S. Ct. at 1384. Although a plaintiff need not be a direct competitor of the defendant in order to bring a

---

[4] Although defendants describe the issue as one of "prudential standing," the Supreme Court has clarified that the term is a "misnomer" as applied to the zone-of-interests analysis, which asks whether 'this particular class of persons ha[s] a right to sue under this substantive statute.'" *Lexmark*, 134 S. Ct. at 1387 (quoting *Ass'n of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675-76 (D.C. Cir. 2013)).

Lanham Act claim, "a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 1388. "To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Id.* at 1395. Thus, *Lexmark* held "that a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 1391.

The complaint contains no facts demonstrating that plaintiff suffered injury in sales or reputation as a result of patients declining to seek treatment from the Hospital. Indeed, the allegations suggest that patients continued to flock to the Hospital for healthcare as a result of Rocket Farms' alleged conduct. In its opposition, plaintiff asserts for the first time that it suffered reputational harm because "the Plan's low level of payments led the Hospital to bill the patients for the balance" and because "patients who were caught in the middle of this payment dispute may no longer want to come to the Hospital in the future." (Dkt. 15, Opp. at ECF p. 27). Additionally, plaintiff suggests that the Hospital "was impaired in its ability to receive and treat other patients who had health insurance that would pay far better than the Plan; instead it had to accept a low and unacceptable level of payment for Rocket Farms' own members." (*Id.*). Putting aside that these assertions appear nowhere in the complaint, they do not save plaintiff's claim anyway. To begin, the complaint alleges that the Hospital is "obligated, by law, to treat all individuals who present at its emergency room" (Complaint ¶ 235); and, the Hospital's speculation as to what patients may or may not do with respect to seeking treatment in the future is just that---speculation. Moreover, plaintiff's assertions, like the complaint's allegations, indicate that the Hospital's alleged economic injury stems, not from Rocket Farms' alleged misrepresentations, but from plaintiff having "to accept an extremely low level of payment" under the Plan. (Complaint ¶ 235).

Accordingly, the complaint does not allege facts demonstrating that the Hospital falls within the "zone of interest" protected by the Lanham Act's false advertising provisions, and plaintiff has not convincingly demonstrated that the deficient allegations may be remedied on

amendment.  Defendants' motion to dismiss this claim therefore is granted, without leave to amend.

### E.    Claims 4 and 5:   Intentional and Negligent Misrepresentation

These claims are based on the same underlying facts:  The complaint alleges that, in phone calls to verify/approve coverage for several Rocket Farms patients, defendants (falsely) represented to the Hospital that the Plan would cover 70% of the patient's medical bills, up to $21,666, after which it would cover 100%---and failed to disclose that payments under the Plan would actually be capped at 140% of Medicare.  Additionally, plaintiff alleges that defendants affirmatively represented to the Hospital that the Plan had a maximum out-of-pocket limit of $6,350 for each claim, but failed to disclose any limitation or exclusion that (reportedly) applied to the Plan's MOOP.  Plaintiff says that it relied to its detriment on these alleged misrepresentations and that the Plan did not pay as promised, instead paying only about a third of the total expense for each patient's treatment.  (Complaint ¶¶ 193-210, 241-257).

Defendants argue that these claims fail to satisfy the heightened pleading standard for fraud claims under Fed. R. Civ. P. 9(b).[5]  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*  "A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations.  While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient."  *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).  "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal quotations and citation

---

[5] Defendants originally argued that these claims were preempted by ERISA.  However, at oral argument, defendants confirmed that they are no longer pursuing that argument.  *See Envirotech Molded Products.*, 2017 WL 5172389 at *5-6 (concluding that ERISA did not preempt plaintiff's claims for negligent and intentional misrepresentation).

omitted).

The Hospital's complaint identifies the specific patients (by initials), the nature of the services provided, the month and year when the authorization phone calls were made, and what defendants' representatives allegedly told the Hospital staff, i.e., that the Plan covered 70% of the patient's medical bills up to a certain amount (the dollar amounts are specified for each patient), after which it would cover 100%. These allegations state a plausible claim for relief and are sufficient to put defendants on notice as to the nature of the alleged fraud such that they can defend against the charge. Defendants' motion to dismiss Claims 4 and 5 is denied.

### ORDER

Based on the foregoing, defendant's motion to dismiss the complaint is granted in part and denied in part:

- Claim 1 (ERISA § 502(a)(1)(B)) is dismissed, with leave to amend only as specified above;
- Claim 2 (ACA Section 2707 "via ERISA § 502(a)(1)(B)) is dismissed with respect to the Plan's MOOP terms, with leave to amend. However, defendants' motion to dismiss this claim based on the ACA's MOOP provisions is denied.
- Claim 3 (Lanham Act § 43(a) (unfair advertising) is dismissed without leave to amend.
- The motion to dismiss Claims 4 and 5 (intentional and negligent misrepresentation) is denied.

If plaintiff chooses to amend its complaint, the amended pleading must be filed by **June 15, 2018**.

SO ORDERED.

Dated: May 31, 2018

_____
HOWARD R. LLOYD
United States Magistrate Judge