UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

SALINAS VALLEY MEMORIAL
HEALTHCARE SYSTEM,

          Plaintiff,

    v.

MONTEREY PENINSULA
HORTICULTURE, INC., et al.,

          Defendants.

Case No.17-cv-07076-VKD

**ORDER DENYING MOTION TO
DISMISS FIRST AMENDED
COMPLAINT**

Re: Dkt. No. 34

Plaintiff Salinas Valley Memorial Healthcare System ("Hospital") is a public hospital district and healthcare system in Monterey County.  The Hospital sues to recover over $1.4 million it claims defendants owe for alleged underpaid healthcare services that the Hospital provided to the employees of defendant Monterey Peninsula Horticulture, Inc. dba Rocket Farms ("Rocket Farms") and their families.  Rocket Farms is an agricultural business based in Salinas, California. Defendant Monterey Peninsula Horticulture, Inc./Steven Roberts Original Desserts, LLC Employee Benefit Plan ("Plan") is a (now terminated) self-funded ERISA benefits plan.

Defendants move to dismiss the First Amended Complaint ("FAC") for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Hospital opposes the motion.  Upon consideration of the moving and responding papers, as well as the oral arguments presented, the Court denies the motion.[1]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The following background facts are drawn from the FAC and, for purposes of resolving the

---

[1]  All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

present motion, are deemed true:

Rocket Farms previously purchased a health insurance policy for its employees and their families through the Western Growers Association ("Association"). Dkt. No. 32 ¶ 21. The Hospital says that, prior to July 1, 2014 and pursuant to its contract with the Association, it was reimbursed for 83% of its bills for inpatient care and 82% of its bills for outpatient care. *Id*.

Beginning on July 1, 2014 and continuing through June 30, 2017, Rocket Farms switched from the Association's contracted health care arrangement to the defendant self-funded Plan, which had no network of hospitals. Dkt. No. 32 ¶¶ 22, 52. Under this self-funded arrangement, Rocket Farms was directly liable for all of the Plan benefits. *Id*. ¶ 30. The Hospital alleges that Rocket Farms did not have the experience to manage a self-funded Plan, but was persuaded by unreliable consultants and brokers to adopt a self-funded model as a way to save money by cutting employees' healthcare benefits. *Id*. ¶ 32.

In lieu of a hospital network, Rocket Farms allegedly attempted to establish a "reference pricing" model in which prices are set for certain procedures and the only "in-network" providers are those that accept the "reference" prices paid by the Plan. Dkt. No. 32 ¶ 55. However, the Hospital contends that Rocket Farms' self-funded arrangement was flawed and part of a deliberate strategy by defendants to cut costs by diminishing employees' healthcare benefits and underpaying the Hospital. *Id.* ¶ 33.

After shifting to the self-funded Plan, Rocket Farms allegedly began paying roughly only a third of the amounts the Hospital billed for services rendered. Specifically, the FAC alleges that every one of the Hospital's reimbursement claims was paid at 140% or 150%[2] of rates the federal government pays under the Medicare program, which plaintiff says is a woefully inadequate level of reimbursement from a non-governmental payor like Rocket Farms. Dkt. No. 32 ¶¶ 39-40. Defendants reportedly knew that no hospital in Salinas would accept such rates as payment in full,

---

[2] Rocket Farms had "Silver" and "Gold" self-funded benefit plans. Under the Silver plan, claims allegedly were paid at 140% of Medicare, whereas claims under the Gold plan were reimbursed at 150% of Medicare. The parties refer to the 140% and 150% rates interchangeably. The Court uses the term "140% of Medicare" as shorthand to refer to the levels of payment made under both plans.

but they nonetheless used those rates as their standard "reference price" for all procedures performed at any hospital.  *Id.* ¶ 40.

Additionally, Rocket Farms reportedly misled its own employees about the fact that hospital services would only be covered up to 140% of Medicare rates.  Dkt. No. 32 ¶ 42.  The Hospital believes that Rocket Farms assured its employees that the Hospital's services were completely covered by the Plan and encouraged them to visit the Hospital's emergency room, even if they did not need emergency medical care.  *Id.* ¶ 61.  Had employees been made aware that Rocket Farms' self-funded arrangement would only pay for a small portion of their medical bills (leaving employees to foot the significant unpaid balances), the Hospital believes that those individuals might have chosen to purchase their own healthcare, for example, through an insurance broker or through the Covered California exchange established pursuant to the Affordable Care Act ("ACA"), 42 U.S.C. § 18001, *et seq.*  *Id.* ¶ 43.

The Hospital further alleges that defendants improperly denied payment of Plan benefits in an undisclosed and unaccountable manner; denied every one of the Hospital's appeals seeking additional payment; and aggressively threatened litigation when the Hospital asked any of its patients to pay the balance on any unpaid bill.  This conduct allegedly was part of defendants' scheme to ensure that the Hospital was not fairly compensated for medical services.  Dkt. No. 32 ¶ 33.

During the self-funded period, the Hospital says it attempted, unsuccessfully, to negotiate a contract directly with Rocket Farms in order to provide more cost-effective care to Plan beneficiaries.  Dkt. No. 32 ¶ 56.  The Hospital claims that the negotiations failed because Rocket Farms had no intention of dealing with the Hospital in good faith.  *Id.* ¶ 58.  At one point, Rocket Farms offered to pay the Hospital 240% of Medicare rates going forward, but refused to pay for past services that had been reimbursed at 140% of Medicare rates.  *Id.* ¶ 60.  The Hospital contends that the fact that Rocket Farms offered to pay 240% of Medicare rates belies defendants' claims that the Plan could not pay more than 140% of Medicare.  *Id.*

Additionally, the Hospital alleges that for several Rocket Farms patients, in telephone calls to verify or approve coverage, defendants falsely represented to the Hospital that the Plan would

cover 70% of the patient's medical bills, up to a certain dollar amount, after which it would cover 100%, and failed to disclose that payments under the Plan would actually be capped at 140% of Medicare. Dkt. No. 32 ¶¶ 208-225. The Hospital claims that it relied to its detriment on defendants' misrepresentations. Had it known that defendants did not intend to pay in the manner stated during the telephone calls, the Hospital says that it (and the affected patients) would have been able to make alternate arrangements for medical services. *Id*. ¶ 222.

As of July 1, 2017, Rocket Farms returned to the contracted health insurance arrangement it previously had under the Association. Dkt. No. 32 ¶ 6. Although the self-funded Plan is no longer in force, the Hospital contends that Rocket Farms still owes over $1.4 million for the allegedly underpaid services that the Hospital provided during the three-year period that the Plan was in effect. The Hospital's core contention is that the Plan requires the payment of benefits based on the Plan's terms concerning an "Allowable Charge." According to the Hospital, the "Allowable Charge" to be paid for the Hospital's services is much higher than 140% of Medicare. Defendants, on the other hand, contend that the Plan provides for the payment of benefits up to a maximum of 140% of Medicare, and they maintain that the Hospital has already been paid all the benefits that are owed.

The Hospital filed the present action, asserting claims for violation of ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B); the Affordable Care Act ("ACA") Section 2707; and the Lanham Act Section 43(a), 15 U.S.C. § 1125(a)(1)(A). The Hospital also asserted claims for intentional and negligent misrepresentation.

Defendants moved to dismiss the original complaint pursuant to Rule 12(b)(6), arguing that the Hospital failed to state a claim for relief. The Court granted that motion in part and denied it in part. The Court dismissed the Lanham Act claim without leave to amend. The Court dismissed the Hospital's ERISA claim with leave to amend in part. The Court denied defendants' motion to dismiss the claims for alleged violation of the ACA and for intentional and negligent misrepresentation. Dkt. No. 29.

The Hospital timely filed its FAC, reasserting claims for violation of ERISA and the ACA and for intentional and negligent misrepresentation. Defendants once again move to dismiss

pursuant to Rule 12(b)(6), arguing that (1) the Hospital lacks standing to bring claims seeking benefits that, defendants contend, are beyond what the Plan required and (2) the FAC fails to state a plausible claim for relief in any event. Defendants now also assert several new arguments and theories that were not raised on their prior motion to dismiss. With respect to the ERISA claim, they argue that the Plan's one-year statute of limitations bars the Hospital from seeking payment for any benefits claim as to which a final determination was made more than one year before the Hospital filed the present suit. As for the ACA claim, defendants argue that the Plan's 140% of Medicare rate is a "maximum benefit," not a "reference price." As for Claim Nos. 3 and 4 for intentional and negligent misrepresentation, Rocket Farms now contends that those claims are not sufficiently pled as to its role in any alleged fraud.

In opposing the motion, the Hospital argues, at the outset, that the Court should not consider defendants' new arguments and theories. The Hospital otherwise contends that (1) the Plan's one-year statute of limitations cannot be enforced; (2) the FAC now articulates two plausible Plan interpretations to support the ERISA claim that the Hospital is entitled to payment well above 140% of Medicare; and (3) this Court should not disturb the prior rulings denying defendants' motion to dismiss the ACA claim and the claims for intentional and negligent misrepresentation.

For the reasons to be discussed, the Court denies defendants' Rule 12(b)(6) motion to dismiss as to all claims.

## II.    LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory. *Id.* (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)). In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant. *Id.*

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover,

"the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." This means that the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, only plausible claims for relief will survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. A claim is plausible if its factual content permits the court to draw a reasonable inference that the defendant is liable for the alleged misconduct. *Id.* A plaintiff does not have to provide detailed facts, but the pleading must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678.

Documents appended to or incorporated into the complaint or which properly are the subject of judicial notice may be considered along with the complaint when deciding a Rule 12(b)(6) motion. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990).[3]

## III.  DISCUSSION

### A.  Defendants' New Arguments and Theories

As an initial matter, the Hospital argues that Rules 12(g) and 12(h) of the Federal Rules of Civil Procedure prohibit defendants from now raising arguments that were available to them from the outset of this case and which they could have raised in their first motion to dismiss.

Rule 12(g) provides, "Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Fed. R. Civ. P. 12(g)(2). "The consequence of omitting a defense from an earlier motion under Rule 12 depends on type of

---

[3] The Court grants defendants' request to consider the Summary Plan Description ("SPD") for the Silver Plan, effective July 1, 2014 and restated July 1, 2016 (Dkt. No. 34-2). The FAC repeatedly references the SPD's terms. Moreover, the Hospital does not oppose the request or challenge the SPD's authenticity or relevance. *Coto Settlement*, 593 F.3d at 1038. The Hospital's request for the Court to consider its own records, namely a certified transcript of the hearing on defendants' prior motion to dismiss (Dkt. No. 39), is granted as unopposed. Fed. R. Evid. 201.

defense omitted." *Pepper v. Apple, Inc. (In re Apple IPhone Antitrust Litig.)*, 846 F.3d 313, 317 (9th Cir. 2017). "A defendant who omits a defense under Rules 12(b)(2)-(5)—lack of personal jurisdiction, improper venue, insufficient process, and insufficient service of process—entirely waives that defense." *Id*. (citing Fed. R. Civ. P. 12(h)(1)(A)). "A defendant who omits a defense under Rule 12(b)(6)—failure to state a claim upon which relief can be granted—does not waive that defense." *Id*. at 317-18. "Rule 12(g)(2) provides that a defendant who fails to assert a failure-to-state-a-claim defense in a pre-answer Rule 12 motion cannot assert that defense in a later pre-answer motion under Rule 12(b)(6), but the defense may be asserted in other ways," namely, in a pleading under Rule 7 (e.g., an answer), in a post-answer motion to dismiss under Rule 12(c), or at trial. *Id*. at 318 (citing Fed. R. Civ. 12(h)(2)).

The Hospital points to decisions in which courts in this district have declined to consider arguments in Rule 12(b)(6) motions that could have been raised earlier. More recently in *In re Apple IPhone Antitrust Litig.*, however, the Ninth Circuit adopted a flexible approach to Rule 12(g) that focuses on judicial efficiency. In affirming the district court's decision to consider an argument in a motion to dismiss that could have been raised in an earlier motion, the Ninth Circuit reasoned that Rule 12(g) should be read "in light of the general policy of the Federal Rules of Civil Procedure, expressed in Rule 1," which "directs that the Federal Rules 'be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding.'" *In re Apple IPhone Antitrust Litig.*, 846 F.3d at 318 (quoting Fed. R. Civ. P. 1). Observing that Rule 12(g) was designed to "avoid repetitive motion practice, delay, and ambush tactics," the Ninth Circuit noted that the newly asserted argument presented to the district court did "not appear to have been filed for any strategically abusive purpose" and that consideration of the argument "materially expedited the district court's disposition of the case, which was a benefit to both parties." *Id*. at 318, 320 (quotations and citation omitted). The Ninth Circuit further noted that if the district court had not considered the defendant's argument at that time, the defendant would have resorted to the three default alternatives—a Rule 7 pleading, a Rule 12(c) motion to dismiss, or a defense asserted at trial—all of which "would have substantially delayed resolution of [the issue in question], and

would have done so for no apparent purpose." *Id.* at 320.

The Hospital acknowledges that under *In re Apple IPhone Antitrust Litig.*, this Court has discretion to decide whether to entertain defendants' new arguments and theories. It simply argues that the Court should exercise its discretion in the Hospital's favor on this point. However, the Court finds nothing to suggest that defendants raised these arguments now for a strategically abusive purpose. Moreover, even if the Court were to decline to address defendants' arguments now, it would do nothing to promote judicial efficiency, since defendants likely would raise the defenses again in their answer, a Rule 12(c) motion to dismiss, or at trial. Accordingly, the Court exercises its discretion to address defendants' new arguments.

### B.   Claim 1:   Benefits under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

#### 1.   Standing

ERISA Section 502(a)(1)(B) provides that a participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Hospital is not a Plan participant or beneficiary. Nevertheless, providers may obtain derivative standing to sue by an assignment from a plan participant or beneficiary. *Misic v. Bldg. Serv. Employees Health & Welfare Trust*, 789 F.2d 1374, 1378-79 (9th Cir. 1986). The FAC alleges that pursuant to a "'Conditions of Admission' form executed by each Rocket Farms beneficiary or participant (and/or a representative of such individual), the Hospital is the assignee of all benefits under the Plan for each of the claims at issue in this case." Dkt. No. 32 ¶ 227. Thus, the Hospital says it "is entitled under ERISA to pursue all payment that is due to any Rocket Farms beneficiary or participant under the Plan for the medical services rendered to those individuals at the Hospital." *Id.* ¶ 228.

The Court concludes that the Hospital has pled facts that plausibly support its standing to sue based on an assignment of right from plan beneficiaries and participants.

#### 2.   Disputed Plan Interpretations

The Hospital contends that it is entitled to payment well above 140% of Medicare rates for

8

the services it rendered.  It argues that in paying no more than 140% of Medicare, defendants failed to comply with the Plan's own terms, namely, provisions concerning an "Allowable Charge" and the Plan's maximum out-of-pocket ("MOOP") provisions.  Defendants contend that the pertinent Plan terms are those regarding the "Claims Review and Validation Program," which they say provide that the "Permitted payment level" for hospital in-patient and out-patient services can be no more than 140% of Medicare rates.

"To state a claim for benefits under ERISA, plan participants and beneficiaries have to plead facts making it plausible that a provider owes benefits under the plan." *Elizabeth L. v. Aetna Life Ins. Co.*, No. C13-02554 SC, 2014 WL 2621408, at *2 (N.D. Cal. June 12, 2014) (citing 29 U.S.C. § 1132(a)(1)(B); *Iqbal*, 556 U.S. at 677).  Thus, "[a] plaintiff who brings a claim for benefits under ERISA must identify a specific plan term that confers the benefit in question." *Steelman v. Prudential Ins. Co. of America*, No. CIV S-06-2746 LKK/GGH, 2007 WL 1080656, at *7 (E.D. Cal., Apr. 4, 2007) (citation omitted).  An action may be dismissed "if the plaintiff is not entitled to a benefit they seek under the ERISA-regulated plan." *Id.* (citation omitted).

"In interpreting an ERISA plan, the Court must apply contract principles derived from state law, guided by policies expressed in ERISA and other federal labor law." *Elizabeth L.*, 2014 WL 2621408, at *2 (citing *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997)).  "In doing so, the Court must interpret the plan's terms in an ordinary and popular sense, as would a person of average intelligence and experience." *Id.* (citing *Richardson*, 112 F.3d at 985).  "In resolving disputes over ERISA plans, the Court must look first to the agreement's specific language and determine the parties' clear intent, relative to the context giving rise to the language's inclusion." *Id.* (citing *Richardson*, 112 F.3d at 985).  "Finally, the Court must construe each provision consistently with the entire document such that no provision is rendered nugatory." *Id.* (citing *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007)).

For the reasons to be discussed, the Court denies defendants' motion to dismiss the Hospital's ERISA claim.  The parties clearly dispute what provisions of the Plan govern, how they interact (if at all), and how various provisions should be interpreted.  Additionally, it appears that the interpretation of certain provisions may be very context specific, and the present record is not

sufficiently developed for the Court to make a determination at this stage of the proceedings. At most, the Court finds that the Plan provisions are contradictory or ambiguous. For pleading purposes, however, the Hospital has alleged sufficient facts identifying Plan terms that plausibly may confer payment of benefits of more than 140% of Medicare. Moreover, the Court concludes that the Hospital properly may, as an issue of Plan interpretation, assert ERISA disclosure arguments, and that the Plan's one-year limitations period is not enforceable.

### a.    The Hospital's Plan Interpretation

The Hospital's analysis begins with the preface to the Plan's Schedule of Benefits, which provides:

> All benefits described in this Schedule are subject to the exclusions and limitations described more fully herein including, but not limited to, *the Plan Administrator's determination that*: care and treatment is Medically Necessary; *that charges are reasonable and customary (as defined as an Allowable Charge)*; that services, supplies and care are not Experimental and/or Investigational. The meanings of these capitalized terms are in the Defined Terms section of this document.

Dkt. No. 34-2 at 12 (emphasis added); Dkt. No. 32 ¶ 67. The Schedule of Benefits goes on to state that "Covered Charges" include "Hospital Services," such as emergency and in-patient care paid at "70% after $250 copayment (per admission) and deductible." Dkt. No. 34-2 at 14; Dkt. No. 32 ¶ 68. Additionally, the Schedule of Benefits provides that the "Plan will pay the designated percentage of Covered Charges until the maximum out-of-pocket amounts are reached, at which time the Plan will pay 100% of the remainder of Covered Charges for the rest of the Calendar Year unless stated otherwise." Dkt. No. 34-2 at 14. However, three types of charges "do not apply toward the maximum out-of-pocket amount and are never paid at 100%": (1) "Amounts over the Allowable Charge"; (2) "Ineligible charges" and (3) "Invalid Charges (Refer to the Claims Review and Validation Program section)." *Id.*

According to the Hospital, proper analysis of the Plan's payment levels begins and ends with the "Allowable Charge." It points out that the "Plan Exclusions" section defines "Excess charges" as "[t]he part of an expense for care and treatment of an Injury or Sickness that is in excess of the Allowable Charge." Dkt. No. 34-2 at 43. Additionally, the Hospital notes that the

Plan also discusses overpayments in terms of an "Allowable Charge": "Further, this Plan may pay benefits that are later found to be greater than the Allowable Charge. In this case, this Plan may recover the amount of the overpayment from the source to which it was paid." *Id*. at 70. Moreover, the Hospital says that the Schedule of Benefits uses the term "Covered Charges" (Dkt. No. 34-2 at 13, 14-19), which is also defined with reference to an "Allowable Charge": "Covered Charges are the Allowable Charges that are incurred for the following items of service and supply." *Id*. at 23.

Thus, the Hospital argues that the Court need look no further than the Plan's definition of "Allowable Charge" to determine that the Plan requires payment of benefits at rates much higher than 140% of Medicare. The Plan defines an "Allowable Charge" as follows:

> **Allowable Charge** means the charge for a treatment, service, or supply that is the ***lesser of***: (i) the charge made by the provider that furnished the care, service, or supply; (ii) the negotiated amount established by a provider network arrangement or other discounting or negotiation arrangement; (iii) the reasonable and customary charge for the same treatment, service, or supply furnished in the same geographic area by a provider of like service as further described below; or (iv) an amount equivalent to the following:
>
> - For specialty drugs, the lesser of average wholesale price (AWP) minus 10% or the amount set by the Plan's prescription drug service vendor;
>
> - For inpatient or outpatient facility claims, an amount equivalent to 200% of the Medicare equivalent allowable.
>
> The ***reasonable and customary charge shall mean*** an amount equivalent to the **85th percentile** of a ***commercially available database***, or such other cost or quality-based reimbursement methodologies as may be available and adopted by the Plan. ***If there are insufficient charges submitted for a given procedure, the Plan will determine an Allowable Charge based upon charges made for similar services. Determination of the reasonable and customary charge will consider the nature and severity of the condition being treated, medical complications or unusual circumstances that require more time, skill or experience, and the cost and quality data for that provider***.
>
> For Covered Charges rendered by a Physician, ***Hospital*** or Ancillary Provider in a geographic area where ***applicable law*** dictates the maximum amount that can be billed by the rendering provider, ***the Allowable Charge shall mean the amount established by applicable law for that Covered Charge[]***.

11

> ***The Plan Administrator or its designee has the ultimate***
> ***discretionary authority to determine an Allowable Charge***,
> including establishing the negotiated terms of a provider
> arrangement (including a PPO agreement if applicable) as the
> Allowable Charge even if such negotiated terms do not satisfy the
> lesser of test described above.

Dkt. No. 34-2 at 37 (emphasis added).

On defendants' prior motion to dismiss, the Hospital argued that the Plan defined an "Allowable Charge" as the "reasonable and customary charge" for services, and it contended that the "reasonable and customary charge" under California law is well above 140% of Medicare rates. However, the Hospital relied on the second and third paragraphs of the Plan's "Allowable Charge" definition and ignored the first part of the definition that says that an "Allowable Charge" is the "lesser of" four options. Moreover, while the Hospital argued that the "applicable law" referenced in the definition's third paragraph means California law, the Hospital had no rejoinder to defendants' contention that ERISA preempts state law. As discussed above, the Court dismissed the Hospital's ERISA claim with leave to amend.

In its FAC, the Hospital now alleges that the Plan, properly interpreted, provides that an "Allowable Charge" will always be higher than 140% of Medicare. Dkt. No. 32 ¶¶ 67-84. According to the Hospital, the Plan's "Allowable Charge" definition provides two means for determining the level of payment to be made for services rendered: (1) by identifying the "lesser of" four payment options or (2) by looking at the level of payment provided by "applicable law." Under either analysis, the Hospital contends that payment for the services it provided will always be more than 140% of Medicare.

With respect to the "lesser of" four options provision, the Hospital contends that the four categories specified in the "Allowable Charge" definition all provide for payment greater than 140% of Medicare. For example, the Hospital says that the first charge category, the provider's charges, typically are higher than 140% of Medicare. As for the second category, a negotiated rate, the FAC alleges that in contract negotiations, Rocket Farms offered to pay the Hospital 240% of Medicare. Dkt. No. 32 ¶¶ 60, 74. The fourth category provides for payment at 200% of Medicare, which clearly is higher than 140% of Medicare. And highlighting the third category, the "reasonable and customary charge . . . in the same geographic area by a provider of like

12

service" (Dkt. No. 34-2 at 37), the Hospital contends that determining which of these four

categories is the "lesser of" level of payment is highly fact- and context-dependent and can vary

from claim to claim.  As such, the Hospital argues that defendants cannot establish, at this stage of

the litigation, that the "lesser of" provision precludes the relief the Hospital seeks, as a matter of

law.

Alternatively, under the "applicable law" analysis, the Hospital argues that the "lesser of"

provision is superseded by the third paragraph of the "Allowable Charge" definition, which the

Hospital says expressly incorporates and adopts "applicable" California law as the proper means

to determine the level of payment to be made:

> For Covered Charges rendered by a Physician, **Hospital** or Ancillary
> Provider in a geographic area where **applicable law** dictates the
> **maximum amount that can be billed** by the rendering provider, **the
> Allowable Charge shall mean the amount established by
> applicable law for that Covered Charge[]**.

Dkt. No. 34-2 at 37 (emphasis added).  Although defendants argue that the Plan gave them the

discretion to determine the "Allowable Charge," the Hospital maintains that the Plan's plain

language provides that "the Allowable Charge *shall mean* the amount established by applicable

law for that Covered Charge[]."  *Id.* (emphasis added).  The Hospital emphasizes that it is "not

seeking to impose California law upon the Plan in a manner that would be preempted by ERISA."

Dkt. No. 32 ¶ 85.  Rather, it says that the application of California law is a result dictated by the

Plan itself in the "Allowable Charge" definition.  *Id.*

Notably, defendants no longer assert ERISA preemption as to the Hospital's invocation of

California law.  Instead, they contend that the Hospital's "applicable law" analysis is a non-starter

because they claim that California has laws governing the maximum amount that a provider may

be *paid*, but not the "maximum amount that can be *billed* by the rendering provider."  Dkt. No. 34-

2 at 37 (emphasis added).  The Hospital disagrees.  Citing *Gould v. Workers' Compensation

Appeals Bd.*, 4 Cal. App.4th 1059 (1992) and *Children's Hospital Central California v. Blue

Cross of California*, 226 Cal. App.4th 1260 (2014), the FAC alleges that California "has a very

well developed body of law that governs 'the maximum amount that can be billed by the rendering

provider' in the absence of a contract between payors and providers."  Dkt. No. 32 ¶ 79.

13

Defendants argue that *Gould* and *Children's Hospital* simply address what the providers in those cases could be paid for their services, but not the maximum amounts that those providers could charge.

In *Gould*, the court addressed, in the workers' compensation context, the showing that the plaintiff provider had to make to justify fees in excess of an official medical fee schedule. Thus, at least ostensibly, *Gould* concerned the amount of fees the provider properly could charge for his services. As a practical matter, however, the Hospital appears to agree that both *Gould* and *Children's Hospital* ultimately concern the amount the providers in question could fairly be paid for their services. Indeed, *Gould* sets out several factors—including the nature of the services provided, the fees usually charged by the provider, and prevailing provider rates charged in the general geographic area in which the services were rendered—which subsequently were adopted in Title 28 of the California Code of Regulations § 1300.71(a)(3)(B) as the minimum, non-exclusive criteria for reimbursement of a claim. *Gould*, 4 Cal. App.4th at 1071; *Children's Hospital,* 226 Cal. App. 4th at 1273. Even so, the Hospital correctly notes that the Court must construe each provision of the Plan consistently with the entire document such that no provision is rendered nugatory. *Elizabeth L.*, 2014 WL 2621408, at *2 (citing *Gilliam*, 488 F.3d at 1194). The Hospital argues that, properly construed, the Plan's "Allowable Charge" definition means that no matter what the Hospital actually bills for its services, the Plan must pay the "Allowable Charge" dictated by California law. Defendants have no answer to the Hospital's contention that no state limits the amount that hospitals can bill for their services and that defendants' proffered interpretation renders the third paragraph of the "Allowable Charge" definition nugatory.

The Court does not decide here whether the Hospital's interpretation of the Plan language is correct; however, it declines on the record presented to find that the Hospital's "applicable law" theory is implausible as a matter of law.

### b. Defendants' Plan Interpretation

Defendants offer their own Plan interpretation to explain why the Hospital's interpretation of the Plan's terms is incorrect. Essentially, defendants contend that the term "Covered Charges" (not "Allowable Charge") is the Plan's key term. Referring to the Plan's Medical Benefits section,

defendants argue that "Covered Charges" encompass "Allowable Charges that are incurred for" a list of services and items that include "Hospital Care," and which "are subject to the benefit limits, exclusions, and other provisions in the Plan":

> Covered Charges are the Allowable Charges that are incurred for the following items of service and supply. These charges are subject to the benefit limits, exclusions and other provisions of this Plan. A charge is incurred on the date that the service or supply is performed or furnished.
>
> > (1) **Hospital Care**. The medical services and supplies furnished by a Hospital or Ambulatory Surgical Center or a Birthing Center. Covered Charges for room and board will be payable as shown in the Schedule of Benefits. After 23 observation hours, a confinement will be considered an inpatient confinement.
> >
> > Room charges made by a Hospital having only private rooms will be payable at the average private room rate of that facility.
> >
> > Charges for an Intensive Care Unit stay are payable as described in the Schedule of Benefits.

Dkt. No. 34-2 at 23-24.

### i. "Invalid Charges" exception for "Covered Charges"

Defendants argue that the FAC ignores that the Plan provides an "Invalid Charges" exception to "Covered Charges." Here, defendants refer back to the portion of the Schedule of Benefits that provides: "The Plan will pay the designated percentage of Covered Charges until the maximum out-of-pocket amounts are reached, at which time the Plan will pay 100% of the remainder of Covered Charges for the rest of the Calendar Year unless stated otherwise." Dkt. No. 34-2 at 14. They emphasize that the Schedule of Benefits goes on to state that three types of charges "do not apply toward the maximum out-of-pocket amount and are never paid at 100%": (1) "Amounts over the Allowable Charge"; (2) "Ineligible charges" and (3) "Invalid Charges (Refer to the Claims Review and Validation Program section)." Dkt. No. 34-2 at 14.

Defendants argue that the third clause referring to "Invalid Charges (Refer to the Claims Review and Validation Program section)" provides an exception for "Covered Charges" that applies to the Hospital's bills. As defined in the Claims Review and Validation Program section of the SPD, "Invalid Charges" means:

(a) charges that are found to be based on "Errors," "Unbundling," "Misidentification" or "Unclear Description" (as such terms are defined in this "Claim Review and Validation Program" section of the Plan); *(b) charges for fees or services determined not to have been Medically Necessary, Usual, Customary and Reasonable*; or (c) charges that are otherwise determined by the Claims Delegate or the Plan Administrator (or its designee) to be invalid or impermissible based on any applicable law, regulation, rule or professional standard.

Dkt. No. 34-2 at 55 (emphasis added). The term "Usual, Customary and Reasonable Fees," in turn, is defined as:

an amount that would constitute fair and reasonable payment to a *provider* for *covered services* under the facts and circumstances surrounding the provision thereof, taking into consideration the cost to the *physicians* and *practitioners* for providing the *services*, the fees that the *physicians* and *practitioners* typically accepts [sic] as payment for the *services* from or on behalf of the majority of patients receiving the *services*, the fees that *physicians* and *practitioners* of similar training and experience in the same "area" most frequently accept as payment for the *services* from or on behalf of the majority of patients receiving the *services*, and the Medicare reimbursement rates for such *services*. *Usual, customary and reasonable fees may be lower than permitted payment levels but, absent specific findings by the Plan Administrator or Claims Delegate to the contrary, charges shall not constitute usual, customary and reasonable fees to the extent they exceed permitted payment levels. Regardless of typical practices of any physician, practitioner or other providers of comparable services, usual, customary and reasonable fees shall not include invalid charges.*

*Id.* at 57 (emphasis added). Finally, defendants point out that the term "Permitted payment level" means:

the charges for services and supplies listed and included as *covered expenses* under the *Plan*, which are medically necessary for the care and treatment of *illness* or *injury*, but only to the extent that the fees charged therefore are within all applicable limitations and restrictions established in this *Plan* including, but are not limited to, the following levels:

(a) Hospitals & Affiliated Facilities. For charges by *hospital facilities*:

(i) Inpatient Services. The *permitted payment level* for *inpatient covered services* shall be based upon 150% of the *Medicare allowed amount* for the *covered services* or, if greater, 135% of the Cost of the *covered services*; provided, however, that any such *permitted payment level* based on the *cost* of the *covered services* shall be limited to an amount not to exceed 180% of *the Medicare allowed amount* or the amount of *usual, customary and reasonable fees* for the

16

*covered services.*

(ii)  Outpatient Services.  The *permitted payment level* for *outpatient covered services* shall be based upon 150% of the Medicare allowed amount for the *covered services* or, if greater, 135% of the *cost* of the *covered services*; provided, however, that any such *permitted payment level* based on the cost of the covered services shall be limited to an amount not to exceed 180% of the *Medicare allowed amount* or the amount of *usual, customary and reasonable fees* for the *covered services.*

*Id.* at 58.  Taken together, defendants argue that these provisions mean that the maximum benefit payable under the Plan is 140% of Medicare.  In other words, if the provider's usual, customary, and reasonable fees are less than 140% of Medicare, then defendants say that amount will be the payable benefit because it does not exceed the "permitted payment level."  However, if the provider's usual, customary and reasonable fees exceed 140% of Medicare, then defendants argue that these Plan provisions cap the payable benefits at 140% of Medicare.

The Hospital contends, and defendants do not refute, that the term "Usual, Customary and Reasonable Fees," as defined by the Plan, appears to pertain only to "physicians and practitioners."  Dkt. No. 34-2 at 57; Dkt. No. 32 ¶ 69 & n.3.  Thus, it is not clear that the term "Usual, Customary and Reasonable Fees" has any bearing on charges for services provided by a hospital.  The same could also be said of the portion of the "Invalid Charges" definition that is based on "Usual, Customary and Reasonable Fees."

Moreover, it is unclear how the provisions highlighted by defendants interact with the "Allowable Charge" definition that is the basis of the Hospital's Plan interpretation.  Here, the Hospital notes that the "Allowable Charge" definition defines "reasonable and customary charge" in a very different way and that there is nothing in the "Allowable Charge" definition that refers to "permitted payment levels."  Further, defendants do not point to any provision in the Plan that suggests that the terms "reasonable and customary charge" as described in the "Allowable Charge" definition should be used interchangeably with the term "Usual, Customary and Reasonable Fees," as described in the Claim Review and Validation Program section of the Plan.

For these reasons, the Court is not persuaded by defendants' arguments about the alleged "Invalid Charges" exception for "Covered Charges" and declines to grant their motion to dismiss

17

1  on that basis.

2              ii.    **Medical Benefits and Plan Exclusion Provision**

3              Defendants nevertheless argue that the Plan's "Allowable Charge," which forms the basis

4  of the Hospital's Plan interpretation, is limited by the Plan's Claims Review and Validation

5  Program and Permitted Payment Levels.  Here, defendants refer back to the preface of the Plan's

6  Medical Benefits section, which provides, in relevant part, "Hospital and Facility charges will be

7  evaluated under the Claim Review Program, and Covered Charges will be determined based upon

8  the 'Permitted Payment Levels.'  Please refer to the Claim Review and Validation Program section

9  of the Plan for additional information about Claim Review and Permitted Payment Levels."  Dkt.

10  No. 34-2 at 23.  Reiterating that "Covered Charges" include "Allowable Charges" that are incurred

11  for a list of services and items, including "Hospital Care," that "are subject to the benefit limits,

12  exclusions, and other provisions of this Plan," defendants contend that the Claim Review Program

13  is one such "limit[], exclusion[], and other provision[]" under the Plan.  *Id*.

14              Defendants argue that, as defined by the Plan, the "Permitted Payment Level" for hospital

15  charges is 150% of Medicare.  Dkt. No. 34-2 at 58.  They contend that any amount beyond that

16  (i.e., the balance of the Hospital's bills) is the responsibility of the Plan beneficiary.  *Id*. at 12

17  ("Covered Charges will be reimbursed at the Participating Provider Benefit level based on the

18  Allowable Charge.  The Covered Person may be balanced billed by the Non-Participating Provider

19  for any amount over the Allowable Charge.").  As stated in the Schedule of Benefits, defendants

20  contend that amounts in a patient's balance bill are "Amounts over the Allowable Charge," that

21  "do not apply toward the maximum out-of-pocket amount" and are "never paid at 100%.  *Id*. at

22  14.

23              Defendants go on to note that a patient's balance bill therefore is an "Excess Charge" that

24  is excluded from the Plan's coverage.  See Dkt. No. 34-2 at 43 (defining the exclusion for "Excess

25  charges" as "[t]he part of an expense for care and treatment of an Injury or Sickness that is in

26  excess of the Allowable Charge.").  Defendants argue that construing a patient's balance bill as an

27  exclusion is entirely consistent with the Schedule of Benefits provisions cited above.

28              The Hospital maintains that defendants have not, and cannot, show that the Claim Review

18

and Validation Program terms modify or supplant the "Allowable Charge" definition based on what the Hospital characterizes as "two stray references" to "Permitted Payment Levels" and the "Claim Review and Validation Program" in the preface to the Medical Benefits section. In the Hospital's view, defendants simply cannot be permitted to use these "passing" references to read the entire definition of "Allowable Charge" out of the Plan's terms.

As discussed above, the Court finds that, at the very least, the Plan's terms are susceptible to different competing interpretations. On this record, the Court cannot determine, as a matter of law, whose interpretation may be correct. Accordingly, to the extent defendants seek to dismiss the Hospital's ERISA claim based on the Plan's Claim Review and Validation Program terms, their motion to dismiss is denied.

### 3. Conflicts of Interest and ERISA's Disclosure Rules

Defendants separately argue that, insofar as the FAC alleges conflicts of interest (Dkt. No. 32 ¶¶ 37-38, 102, 234-236) and further alleges that the Claim Review and Validation Program provisions are unenforceable because they violate ERISA's disclosure rules (Dkt. No. 32 ¶¶ 88-102), the Hospital lacks standing to assert an ERISA claim on those bases.

### a. Conflicts of interest

Defendants point out that the Court previously dismissed the Hospital's conflicts of interest theory (which the Court construed as a *de facto* claim for breach of fiduciary duty) without leave to amend. Dkt. No. 29. The Hospital contends that the FAC's conflict of interest allegations were not meant to be a *de facto* claim for breach of fiduciary duty, and at oral argument, the Hospital expressly disclaimed any intent to assert such a claim. Instead, the Hospital now says that allegations referring to conflicts of interest were meant to invoke the *de novo* standard of review the Hospital contends should be applied to the determination of ERISA benefit claims. Defendants argue that the Hospital persists in pursuing a *de facto* claim for breach of fiduciary duty in violation of the Court's ruling on the first motion to dismiss. Moreover, they say that the applicable standard of review is not *de novo*, but abuse of discretion, because the Plan gives the Plan Administrator discretion in construing the Plan terms and making determinations regarding eligibility.

The Court declines at this stage of the proceedings and on the record presented to determine what standard of review might apply to the Hospital's benefit claims. To be clear, the Court finds no reason to disturb the prior ruling that there can be no claim for relief for alleged conflicts of interest. Nevertheless, the Hospital having expressly confirmed that it is not asserting such a claim, defendants' motion to dismiss the ERISA claim on this basis is denied.

### b. Disclosure violations

The FAC reiterates allegations that the cited Claim Review and Validation Program terms are confusing, buried deep within the SPD, bear no apparent relation to the rest of the Plan terms, and are not written in a manner calculated to be understood by the average Plan participant. Dkt. No. 32 ¶¶ 88-91. The Hospital maintains that those provisions cannot be enforced because they were inadequately disclosed in violation of ERISA disclosure rules, namely 29 U.S.C. § 1022, which provides that an SPD "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a); Dkt. No. 32 ¶ 93. Additionally, plaintiff alleges (Dkt. No. 32 ¶ 94) that the Claim Review and Validation Program provisions do not comply with the regulation at 29 C.F.R. § 2520.102-2(b), which requires that "either (1) the description or summary of the restrictive provision must be placed 'in close conjunction with the description or summary of benefits,' or (2) the page on which the restrictive provision is described must be 'noted' 'adjacent to the benefit description.'" *Spinedex Physical Therapy USA, Inc. v. United Healthcare of Arizona, Inc*., 770 F.3d 1282, 1295 (9th Cir. 2014) (quoting 29 C.F.R. § 2520.102-2(b)).

On defendants' first motion to dismiss, the Court declined to broadly construe *Spinedex* as generally giving providers the right to enforce ERISA's disclosure rules in derivative suits for payment, but gave the Hospital leave to amend. Dkt. 29 at 12-13. The Hospital now argues that *Spinedex* should not be read too narrowly. It contends that *Spinedex* demonstrates that although a provider's standing to bring suit may be limited to rights that validly are assigned to it, that limited standing presents no obstacle to enforcing ERISA's disclosure rules in derivative suits for payment. This Court agrees.

In *Spinedex*, the plan participants assigned to the plaintiff provider their "rights and benefits" under their respective plans. *Spinedex*, 770 F.3d at 1287. Concluding that the provider, as assignee, "took from its assignors what they had *at the time* of the assignment," the Ninth Circuit held that the provider had no right to bring derivative claims under ERISA for breach of fiduciary duty because "[t]he entire focus of the Assignment is payment for medical services," and there was no indication that the assignments at issue conferred the right to bring claims for breach of fiduciary duty. *Id*. at 1291-92.

Nevertheless, the Ninth Circuit went on to address plan provisions that imposed a two-year time bar on benefits claims. Pursuant to those provisions, the district court held that the provider's derivative suit for payment was untimely. The Ninth Circuit reversed. Specifically, it held that the provisions in question were not properly disclosed as required by 29 U.S.C. § 1022(b), and the failure to properly disclose those provisions rendered them unenforceable. *Spinedex*, 770 F.3d at 1295-96. *See also generally, e.g., King v. Blue Cross and Blue Shield of Illinois*, 871 F.3d 730, 740-47 (9th Cir. 2017) (in a beneficiary action, addressing the beneficiary's ERISA disclosure claim as a plan interpretation issue, separate from the beneficiary's breach of fiduciary duty claim).

Citing *DB Healthcare, LLC v. Blue Cross Blue Shield of Arizona, Inc.*, 852 F.3d 868 (9th Cir. 2017), defendants maintain that the Hospital has no standing to enforce ERISA's disclosure requirements. *DB Healthcare*, however, simply reiterates the basic principle that a provider's right to bring a derivative suit depends on what rights were assigned to it by the beneficiaries. In that case, the healthcare providers sued, as purported assignees of the health plans' participants, claiming that the insurers violated certain ERISA procedural protections when they unilaterally determined that certain blood testing services were not reimbursable. The Ninth Circuit held that the providers could not enforce ERISA's protections either directly as plan beneficiaries or derivatively as assignees. *Id.* at 875-78. In so holding, the Ninth Circuit reaffirmed the general principle in *Spinedex* that "'a non-participant health care provider . . . cannot bring claims for benefits on its own behalf. It must do so derivatively, relying on its patients' assignments of their benefits claims.'" *Id.* at 874 (quoting *Spinedex*, 770 F.3d at 1289). In view of the nature of the

1  governing agreements and purported assignments at issue, the Ninth Circuit concluded that the

2  providers lacked derivative authority to sue for ERISA violations. *Id.* at 876.

3        Defendants also correctly note that in *Regional Med. Ctr. of San Jose v. WH*

4  *Administrators, Inc.*, No. 5:17-cv-03357-EJD, 2017 WL 6513441, at *4 (N.D. Cal., Dec. 20,

5  2017), the court concluded that ERISA's disclosure rules do not apply to providers who file

6  derivative suits based on assignments from plan beneficiaries. In that case, however, the plan in

7  question contained an anti-assignment clause which prohibited patients from assigning the right to

8  sue to recover benefits under the plan. The parties do not point to any such anti-assignment clause

9  here.

10        Based on the foregoing, the Court is persuaded that the Hospital is not precluded from

11  asserting arguments, as a matter of Plan interpretation, that certain Plan provisions allegedly were

12  not properly disclosed under ERISA. Accordingly, defendants' motion to dismiss the ERISA

13  claim on this basis is denied.

14          **4.      One-Year Limitations Period**

15        Even if the Court finds that the Hospital has pled a plausible ERISA claim, defendants

16  argue that the claim is untimely to the extent it is based on benefits claims for which a final

17  determination was made more than one year before the present lawsuit was filed. The Plan

18  provides, in relevant part:

19               The decision of the IRO [Independent Review Office] is binding

20               upon the Plan and the Claimant, except to the extent other remedies
             may be available under applicable law. ***Before filing a lawsuit, the***

21               ***Claimant must exhaust all available levels of review as described***
             ***in this section, unless an exception under applicable law applies.***

22               ***A legal action to obtain benefits must be commenced within one***
             ***(1) year of the date of the Notice of Determination on the final***

23               ***level of internal or external review, whichever is applicable***.

24  Dkt. No. 34-2 at 66.

25        The FAC alleges that the one-year limitations period does not apply because (1) the time

26  bar provision is buried in the Plan's terms and violates ERISA's disclosure rules; and (2) at no

27  time did defendants ever mention the one-year limitation period in over three years of

28  correspondence with the Hospital. Dkt. No. 32 ¶¶ 202-207. Defendants maintain that the Hospital

has no authority to enforce ERISA's disclosure rules. They also argue that they had no duty to inform the Hospital about the limitations period.

On this issue, *Spinedex* is on point. As discussed above, the Ninth Circuit held that a time bar provision disclosed in the last ten or eleven pages of the plans at issue was unenforceable because it was not disclosed in compliance with ERISA regulations. Here, as in *Spinedex*, the Plan's time bar provision is disclosed near the very end of the SPD (i.e., on page 66 of the 87-page document) and is not in close proximity to the Schedule of Benefits on pages 12-13 of the SPD or the Medical Benefits section found on pages 22-23 of that document. Insofar as defendants seek to dismiss the Hospital's ERISA claim based on the one-year limitation provision, their motion to dismiss is denied.

### C.    Claim 2:   ACA Section 2707(b) Out of Pocket Maximum, "via ERISA Section 502(a)(1)(B)"

As an alternative to ERISA, the Hospital seeks to obtain payment through enforcement of the ACA's MOOP provisions. Additionally, if the Court requires, the Hospital seeks to enforce the Plan's MOOP provisions under this claim, rather than under claim 1.

ACA Section 2707(b) limits the maximum out-of-pocket (MOOP) expenses that a health plan can impose on a patient in a plan year: "A group health plan shall ensure that any annual cost-sharing imposed under the plan does not exceed the limitations provided for under [42 U.S.C. § 18022(c)(1)]."). 42 U.S.C. § 300gg-6(b). Section 18022(c)(1), in turn, says that "[t]he cost-sharing incurred under a health plan . . . shall not exceed the dollar amounts in effect" for a given plan year. *Id.* § 18022(c)(1). The FAC reiterates allegations that the ACA's MOOP requirements apply to self-funded ERISA plans, pursuant to ERISA, 29 U.S.C. § 1185d. Dkt. No. 32 ¶ 129. Briefly stated, the Hospital claims that defendants ignored the ACA's cost-sharing limitations by paying only a small portion of the Hospital's bills (i.e., 140% of Medicare) and by failing to count the Hospital's charges toward each patient's MOOP threshold, leaving Plan beneficiaries to pay the considerable balance of the charges. The Hospital claims that once a patient's cost-sharing limit has been met, the ACA requires defendants to pay 100% of the Plan members' medical expenses for covered services above and beyond that MOOP threshold. Dkt. No. 32 ¶ 147.

In their first motion to dismiss, defendants argued that the Hospital lacked standing to enforce ERISA via the ACA. The primary dispute, however, was whether a "non-network providers" cost-sharing exception under ACA, 42 U.S.C. § 18022(c)(3), applied to the Hospital. As relevant here, the Hospital asserted that the exception did not apply because the Plan was based on an improper "reference pricing" model. The Court denied defendants' motion to dismiss.

Defendants now reiterate that the Hospital lacks standing to pursue this claim, but their arguments are based on defendants' contention that the Hospital has already been paid all the benefits that are due under the Plan. Whether or not the Hospital *properly* was paid all benefits due under the Plan, however, is a disputed issue on the merits of the Hospital's claims. And at oral argument, both sides confirmed that they were unaware of any authority addressing whether the Hospital may seek ERISA benefits via a claim under the ACA.

With respect to the Plan's alleged improper reference-based pricing, defendants argue that the FAC fails to state a claim for relief because they maintain that the 140% of Medicare rate is not a "reference price," but merely the maximum benefit payable under the Plan. However, that is a fact issue that cannot properly be resolved on the present motion to dismiss. The FAC alleges that "[a]fter the Hospital submitted each bill for services rendered, one of Defendant's consultants issued a 'Report and Recommendation' for a "Reference Based Pricing Review" for each claim submitted by the Hospital. This report calculated a reference price to be paid for the procedure. This price was inevitably set at 140% of Medicare." Dkt. No. 32 ¶ 170. For present purposes, the Hospital has sufficiently pled that the Plan was based on an improper reference-based pricing model. The Court finds no basis to disturb the prior ruling on this claim, and defendants' motion to dismiss is denied.

### D.    Claims 3 and 4:  Intentional and Negligent Misrepresentation

These two claims are based on the alleged false statements defendants made during phone calls with the Hospital to verify or approve coverage. As discussed, the Hospital claims that defendants falsely represented to the Hospital that the Plan would cover 70% of the patient's medical bills, up to a certain dollar amount, after which it would cover 100%, and failed to disclose that payments under the Plan would actually be capped at 140% of Medicare. Dkt. No.

32 ¶¶ 208-225.

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations. While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001) (internal quotations and citation omitted).

The Court denied defendants' prior motion to dismiss, finding that the original complaint alleged sufficient facts to put defendants on notice of the nature of the fraud, such that they could defend against the Hospital's claims. Dkt. No. 29 at 28.

Rocket Farms now argues that these claims must be dismissed as to it because the FAC does not specifically allege that Rocket Farms made any of the alleged misrepresentations or had any knowledge of the falsity of the statements. Both claims, however, refer to the Plan, its agents, and the defendants as the alleged actors. For pleading purposes, the FAC sufficiently alleges the facts underlying the Hospital's fraud claims, and the Court finds no basis to disturb its ruling on defendants' prior motion to dismiss. Defendants' motion to dismiss the claims for negligent and intentional misrepresentation is denied.

## IV.   CONCLUSION

Based on the foregoing, defendants' Rule 12(b)(6) motion to dismiss the FAC is denied. Defendants shall file their answer to the FAC within 14 days from the date of this order. Fed. R.

Civ. P. 15(a)(3).

**IT IS SO ORDERED.**

Dated:   November 29, 2018

VIRGINIA K. DEMARCHI
United States Magistrate Judge